**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 2 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JULIE N. WELLS; FREEDOM FROM
RELIGION FOUNDATION, INC.;
THE COLORADO CHAPTER OF
THE FREEDOM FROM RELIGION
FOUNDATION, INC.,

       Plaintiff - Appellant,

vs.

CITY AND COUNTY OF DENVER;
DEPARTMENT OF GENERAL
SERVICES OF THE CITY AND
COUNTY OF DENVER;
WELLINGTON WEBB, Mayor of the
City and County of Denver; THOMAS
J. MIGAKI, Manager of the
Department of General Services, City
and County of Denver; JOHN HALL,
Director of the Division of Public
Office Buildings,

       Defendants - Appellees.

No. 00-1040

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 99-Z-2373)**

---

Robert R. Tiernan, Denver, Colorado, for Plaintiffs - Appellants.

Stanley M. Sharoff, Assistant City Attorney (J. Wallace Wortham, Jr., City
Attorney, with him on the brief), Denver, Colorado, for Defendants - Appellees.

Before **KELLY**, **BRISCOE**, Circuit Judges, and **MURGUIA**,[*] District Judge.

**KELLY**, Circuit Judge.

Plaintiffs Julie Wells and the National and Colorado Chapters of the Freedom From Religion Foundation ("FFRF") appeal from the district court's order denying their motion for preliminary injunctive relief. Pursuant to a stipulation by the parties, the court advanced and consolidated trial on the merits with the hearing on Plaintiffs' motion, and entered a final judgment in favor of Defendants. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

## Background

Every year, the City and County of Denver ("the City") erects a holiday display on the steps leading up to the east entrance of the City and County Building ("the East Steps"). The East Steps "are the primary entrance to the City and County Building, . . . the primary access . . . into the second floor rotunda area of the building." Aplt. App. at 85. The 1999 display included a creche, tin soldiers, Christmas trees, snowmen, reindeer and other animals, an array of lights,

---

[*] Honorable Carlos Murguia, District Judge, United States District Court of Kansas, sitting by designation.

and a shed containing Santa Claus and his elves. See Addendum, infra at __ [Op. at 41]. The display also contained a large sign with the message "Happy Holidays from the Keep the Lights Foundation and the sponsors that help maintain the lights at the City and County Building," situated to the far right of the display ("Happy Holidays sign"). Id.; Aplt. Add. at 1-3 (Pl. Ex. 1-5). [1] The Happy Holidays sign, which was built by the City's carpentry shop using public funds, listed six corporate sponsors. Aplt. App. at 86-87. The sponsors' contributions to the non-profit Keep the Lights Foundation were used to reimburse the City for part of the cost of the display. Id. at 88, 102. The display was surrounded by a fence and monitored by motion detectors and security cameras. Id. at 69-70, 88, 102-03. The fenced-off area occupied more than two-thirds of the East Steps' total square footage, leaving open a broad central corridor to allow public access to and from the building. See Addendum, infra at __ [Op. at 41].

On November 12, 1999, the plaintiffs wrote a letter to Defendant John Hall, the Director of Public Office Buildings for the City and County of Denver, requesting permission to place a sign "inside this year's Christmas display area" and quoting the text of the proposed sign ("Winter Solstice sign") as follows:

---

[1] Plaintiffs refer to their exhibits as "Joint Exhibits" to indicate that an exhibit was part of their complaint, as well as their application for a preliminary injunction. The exhibits are not offered in cooperation with the defendants. Aplt. App. at 66. To avoid confusion, we refer to the plaintiffs' exhibits as "Pl. Ex." and the defendants' exhibits as "Def. Ex."

At this season of
THE WINTER SOLSTICE
may reason prevail.

There are no gods,
no devils, no angels,
no heaven or hell.
There is only
our natural world.

THE "CHRIST CHILD" IS A RELIGIOUS MYTH.
THE CITY OF DENVER SHOULD NOT PROMOTE RELIGION.

"I believe in an America
where the separation of church and state
is absolute."

John F. Kennedy – 1960 Presidential campaign.

PRESENTED BY THE FREEDOM FROM RELIGION FOUNDATION

Aplt. Add. at 9 (Pl. Ex. 11).   [2]  On November 28, 1999, having received no response from Denver, Ms. Wells placed the Winter Solstice sign "on the steps of the City and County Building inside the area fenced off for the City's display." Aplt. Br. at 5.  Written on the back of the sign was the Eighth Commandment: "Thou shalt not steal."  Aplt. App. at 58.  Denver removed the sign the following morning.

Plaintiffs filed this action on December 13, 1999, seeking a preliminary

---

[2] The FFRF had written a similar letter in 1998.  Aplt. Add. at 11-12 (Pl. Ex. 12).  Denver responded to the 1998 letter by summarily denying "the foundation's request 'to have its holiday message included in the Christmas display' . . . ."  Id. at 13 (Pl. Ex. 13).

injunction to compel the City "to allow the Plaintiffs to exhibit their winter solstice display on the steps of Denver's City and County Building within the fenced-off area where Defendants' Christmas holiday display is exhibited for as long as the latter display is on exhibit." Id. at 16. At the hearing on that motion, held December 23, 1999, it became clear that Plaintiffs' action included a challenge to the City's policy against unattended displays on the East Steps. Id. at 49; see also id. at 22 (Compl. at ¶¶ 9-10). At the close of the hearing, during which both parties had presented testimony and arguments, the court denied Plaintiffs' motion. Id. at 132-42 (oral ruling). Upon the parties' stipulation that the court's oral ruling "be entered as the final order and judgment," id. at 39, the court advanced and consolidated the trial on the merits with the hearing for preliminary relief, entered a final judgment in favor of the defendants, and dismissed the action with prejudice. Id. at 41-42.

On appeal, Ms. Wells and the FFRF claim that the district court erred in failing to require Denver to justify (1) the exclusion of the Winter Solstice sign from the City's fenced-off holiday display, or (2) the ban on private unattended displays on the East Steps. They contend that both restrictions violate their free speech rights under the First Amendment. One of the plaintiffs' objections to Denver's unattended display ban is their claim that the policy, by virtue of being unwritten, vests unbridled discretion in city officials. Aplt. Br. at 12-14, 17.

They also claim that both restrictions are selectively enforced, and that the district court erroneously denied them the opportunity to develop a factual record on those claims. Id. at 14-19. In addition to their free speech challenges, the plaintiffs assert violations of their rights under the Free Exercise, Establishment, and Equal Protection Clauses. [3]

## Discussion

I.  Do the Plaintiffs' Free Speech Rights Allow Them to Compel Denver to Include the Winter Solstice Sign in the Fenced-Off Holiday Display?

The Supreme Court has articulated a three-step framework to be used when analyzing restrictions on private speech on government property. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788 (1985). First, the court must determine whether the speech at issue is protected by the First Amendment. Id. at 797. If so, the court must then "identify the nature of the forum, because

---

[3] Plaintiffs do not challenge the inclusion of the creche in the display. Cf. County of Allegheny v. ACLU, 492 U.S. 573 (1989); Lynch v. Donnelly, 465 U.S. 668 (1984). Prior challenges to the creche have been unsuccessful. See Citizens Concerned for Separation of Church & State v. City & County of Denver, 508 F. Supp. 823 (D. Colo. 1981) (rejecting challenge under the Establishment Clause of the U.S. Constitution), aff'd, No. 82-1022 (10th Cir. May 14, 1984) (unpublished order) (upholding district court's decision on basis that challenged display was indistinguishable from display upheld in Lynch v. Donnelly, 465 U.S. 668 (1984)); see also Conrad v. City & County of Denver, 724 P.2d 1309 (Colo. 1986) (rejecting challenge under the Preference Clause of the Colorado Constitution); Citizens Concerned for Separation of Church & State v. City & County of Denver, 628 F.2d 1289 (10th Cir. 1980) (holding that organizational plaintiff failed to establish standing to challenge creche).

the extent to which the Government may limit access depends on whether the forum is public or nonpublic." <u>Id.</u> Third, the court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard," <u>e.g.</u>, whether a content-based restriction can survive strict scrutiny, whether a content-neutral restriction is a valid regulation of the time, place, or manner of speech, or whether a restriction in a nonpublic forum is reasonable. <u>Id.</u> When the government is the speaker, however, "different principles" apply. <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 834 (1995).

When the government speaks, either directly or through private intermediaries, it is constitutionally entitled to make "content-based choices," <u>id.</u> at 833, and to engage in "viewpoint-based funding decisions," <u>Legal Serv. Corp. v. Velazquez</u>, 121 S. Ct. 1043, 1048 (2001). Thus, our analysis of restrictions that arise in the context of government speech is "altogether different" than the analysis set forth in <u>Cornelius</u>. <u>Bd. of Regents of Univ. of Wisc. Sys. v. Southworth</u>, 529 U.S. 217, 235 (2000); <u>see also id.</u> ("The Court has not held, or suggested, that when the government speaks the rules we have discussed [regarding public fora and viewpoint neutrality] come into play."); <u>Latino Officers Ass'n, New York, Inc. v. City of New York</u>, 196 F.3d 458, 468 (2d Cir. 1999) (noting in dicta that "the government may regulate its own expression in ways that would be unconstitutional were a private party the speaker"), <u>cert.</u>

- 7 -

denied, 528 U.S. 1159 (2000). Although the Supreme Court has applied these principles in only one case, Rust v. Sullivan, 500 U.S. 173, 192-93 (1991) (sustaining a prohibition on abortion-related advice by recipients of federal funds designated for family-planning counseling), the Court has discussed the government speech doctrine at some length in three recent cases. Velazquez, 121 S. Ct. at 1048; Southworth, 529 U.S. at 235; Rosenberger, 515 U.S. at 833. Thus, we believe that the doctrine is a viable one, and that it is appropriate to employ it in the case before us. Cf. Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003, 1011 (9th Cir. 2000), cert. denied, 121 S. Ct. 1653 (2001); Knights of the Ku Klux Klan v. Curators of the Univ. of Mo., 203 F.3d 1085, 1093-94 (8th Cir.) [hereinafter Knights of the KKK], cert. denied, 121 S. Ct. 49 (2000); Muir v. Ala. Educ. Television Comm'n, 688 F.2d 1033, 1044 (5th Cir. 1982) (en banc) (predating Rust).

Under the government speech doctrine, the exclusion of the Winter Solstice sign from the fenced-off display raises two questions. First, given that the display constitutes speech, who is the speaker? Second, if the speaker is the City of Denver, to what extent may it control the contents of the display?

A.  Whose Speech Is It?

Denver owns each component part of the display. Aplt. App. at 89. The City maintains and replaces those parts when necessary, it erects the fence that

surrounds the display, and it provides video cameras, motion detectors, and a security guard to protect the display.  Id. at 69-70, 88-89, 102-03.  In Denver's view, the display is the City's message to the community.  Id. at 95-96, 101-04.  On the other hand, Ms. Wells and the FFRF contend that the display is merely an assortment of private speech by corporations that have paid for the privilege.  E.g., id. at 95.  Plaintiffs' characterization of the display is not supported by the record.

Plaintiffs' argument revolves around the large Happy Holidays sign, which stands inside the fence at the far right of the display.  See Addendum, infra at __ [Op. at 41]. [4]  According to the City, the Happy Holidays sign is a "Thank You" from Denver to the sponsors, Aplee. Br. at 20 n.10, and the district court agreed.  Aplt. App. at 140-41.  In the plaintiffs' view, however, the plain language of the sign demonstrates that it is a message  from -- not  to -- the sponsors, and they assert that they are equally entitled to communicate their message from within the

---

[4] As shown in the Addendum, the text of the sign is as follows: on the left, "HAPPY HOLIDAYS FROM THE Keep the Lights Foundation and the sponsors that help maintain the lights at the City and County Building," and on the right, "NEWS4 Spirit of Colorado", "Coors Light", and "King Soopers • AAA of Colorado • Denver Rocky Mountain News • Rock Bottom Brewery".  "HAPPY HOLIDAYS", "NEWS4", and "Coors Light" are written in the largest font, and are therefore the most prominent.  The font used for the phrases "FROM THE Keep the Lights Foundation" and "Spirit of Colorado," and to list the other four corporate sponsors is about half that size.  The phrase "and the sponsors . . ." is even smaller, about one-quarter the size of the largest font.

fence. Aplt. Br. at 18-19. We conclude that the sign is Denver's speech, not that of the listed corporations.

The Supreme Court has provided very little guidance as to what constitutes government speech. As noted, we are aware of only one case, Rust v. Sullivan, 500 U.S. 173 (1991), in which the Court actually applied the principles that underlie the government speech doctrine. In that case, the Court "upheld the government's prohibition on abortion-related advice applicable to recipients of federal funds [under Title X] for family planning counseling." Rosenberger, 515 U.S. at 833 (citing Rust, 500 U.S. at 194). We recognize that " Rust did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting the holding in later cases, however, [the Supreme Court has] explained Rust on this understanding." Velazquez, 121 S. Ct. at 1048. The other Supreme Court cases that have discussed the doctrine have done so only in dicta. Id.; Southworth, 529 U.S. at 235; Rosenberger, 515 U.S. at 833. In each case, the Court held that the speech at issue did not constitute government speech. Velazquez, 121 S. Ct. at 1049 ("The advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept."); Southworth, 529 U.S. at 235 ("In the instant case, the speech is not that of the University or its agents. It is not, furthermore,

- 10 -

speech by an instructor or a professor in the academic context, where principles applicable to government speech would have to be considered."); Rosenberger, 515 U.S. at 841 ("The University has taken pains to disassociate itself from the private speech involved in this case."). [5] A few of our sister circuits, however, have had occasion to apply the government speech doctrine, and their opinions are instructive. Downs, 228 F.3d at 1013-16; Knights of the KKK, 203 F.3d at 1093-94; see also Muir, 688 F.2d at 1044.

The Eighth Circuit's opinion in Knights of the KKK is particularly on point. That case arose when the Ku Klux Klan of Missouri wrote to the University of Missouri's public radio station, KWMU, offering to underwrite four segments of National Public Radio's "All Things Considered." 208 F.3d at 1089. Under federal law, public radio stations must acknowledge the underwriters (sponsors) of particular broadcasts by identifying them, on the air, during the broadcast. Id. at 1088 (citing 47 U.S.C. § 317(a)(1)). To encourage contributions, KWMU operated an "enhanced underwriting" program, pursuant to which acknowledgments could include a limited amount of additional information about the underwriter. Id. at 1088-89 & n.3 (citations omitted). The Klan

---

[5] The Court has consistently "emphasized the importance of context in determining the extent to which the government can control speech." Snyder v. Murray City Corp., 159 F.3d 1227, 1243 (10th Cir. 1998) (Briscoe, J., dissenting) (citing Rosenberger, 515 U.S. at 833-34); accord Velazquez, 121 S. Ct. at 1049-52; Southworth, 529 U.S. at 234-35.

included the following proposed announcement with its offer of funds:

> The Knights of the Ku Klux Klan, a White Christian organization, standing up for rights and values of White Christian America since 1865. For more information[,] please contact the Knights of the Ku Klux Klan, at [mailing address]. Let your voice be heard!

Id. at 1089 (first alteration in original). When the station declined the Klan's offer, the organization sued, alleging violations of the First Amendment and the Equal Protection Clause. The Eighth Circuit rejected both challenges, holding, inter alia, that the underwriting acknowledgments constituted government speech. Id. at 1093.

To support that conclusion, the Eighth Circuit relied on a number of factors: (1) that "the central purpose of the enhanced underwriting program is not to promote the views of the donors;" (2) that the station exercised editorial control over the content of acknowledgment scripts; (3) that the literal speaker was a KWMU employee, not a Klan representative; and (4) that ultimate responsibility for the contents of the broadcast rested with KWMU, not with the Klan. Id. at 1093-94. The Ninth Circuit relied on similar factors in Downs, in which the court rejected a public school teacher's claim that he had a First Amendment right to respond to his school's recognition of Gay and Lesbian Awareness month by posting anti-homosexuality materials on a school bulletin board. See Downs, 228 F.3d at 1011-12 (holding that content of bulletin boards was government speech in that boards were used to express school policy, that

- 12 -

access was limited to faculty and staff, that "postings were subject to the oversight of the school principals," that the school district had made no "affirmative effort to disclaim responsibility for the [boards'] content," and that the boards were "the property and responsibility" of the school and the district) . Due to the "special characteristics of the school environment," Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)), we rely primarily on the four factors articulated in Knights of the KKK.[6]

As to the purpose of the sign, the record evidence includes the City's complete control over the sign's construction, message, and placement, as well as Mr. Hall's testimony that "[t]he sign is there to thank the sponsors and the citizens for the support of the cost of the display. . . . It is there to recognize their financial support and presentation of the display." Aplt. App. at 96; see also id. at 102-03. The district court found Mr. Hall's testimony to be credible, id. at 140, and we cannot say that finding was clearly erroneous. The fact that the sponsors may receive an incidental benefit from the Happy Holidays sign -- in the form of publicity and good will -- does not refute Mr. Hall's testimony as to the sign's

_____

[6] Although Downs did involve speech in a secondary school, the Ninth Circuit indicated that its holding was neither controlled by nor limited to the school setting in which the case arose. E.g., 228 F.3d at 1011 ("This case is not controlled by [the leading Supreme Court and Ninth Circuit school cases] because it is a case of the government itself speaking . . . .").

- 13 -

purpose. Indeed, any benefit that accrues to the sponsors ultimately serves the City's interests by providing current and putative sponsors with an incentive to contribute to the Keep the Lights Foundation in the future. In this sense, the sign is comparable to the enhanced underwriter acknowledgments in <u>Knights of the KKK</u>. <u>See</u> 203 F.3d at 1088, 1093-94 & nn.10-11.

Second, it is uncontroverted that the City built, paid for, and erected the sign. Aplt. App. at 86-87; <u>see also</u> <u>Knights of the KKK</u>, 203 F.3d at 1094 n.9 (recognizing that the announcements at issue served primarily to identify sponsors, but noting that "conveyance of this collateral information remains a communicative act of the government"). Significantly, there is no indication that any of the corporate sponsors even knew about the Happy Holidays sign, much less exercised any editorial control over its design or content. Ms. Wells and the FFRF could have obtained discovery on this issue by serving interrogatories on Denver, <u>see</u> Fed. R. Civ. P. 33, or by deposing representatives of the listed corporations. <u>See</u> Fed. R. Civ. P. 30(a)(1) (allowing deposition of non-party); Fed. R. Civ. P. 45 (allowing party to subpoena witness to appear at deposition). Rather than pursue these options, however, Plaintiffs stipulated to the entry of a final judgment. Aplt. App. at 38-40. According to that stipulation, "[n]either the Plaintiffs nor the Defendants has any additional witnesses, <u>evidence</u>, or argument to present to the Court at this time and, therefore, agree that this action may,

- 14 -

pursuant to Rule 65(a)(2) F.R.C.P., be advanced and consolidated on the merits based upon the evidence received at the hearing on the Motion for Preliminary Injunction." Id. at 39, ¶ 4 (emphasis added).

As to the final Knights of the KKK factor, this litigation is itself an indication that the City bears the ultimate responsibility for the content of the display. Even more persuasive is the fact that the City has assumed full responsibility for providing security for the display, including a fence to guard against theft and protect citizens from possible electrical hazards, Aplt. App. at 88, video cameras, id. at 102-03, motion detectors, id., and a security guard. Id. at 69-70, 103. Accordingly, we conclude that the holiday display, including the Happy Holidays sign, is government speech.

The dissent relies on a footnote in Knights of the KKK for the proposition that "[a]n additional factor relevant to the inquiry is who the listener believes to be the speaker." Infra at __ [Dissent at 3] (citing Knights of the KKK, 203 F.3d at 1094 n.9 ). Even assuming, arguendo, that "listeners' perception" is one relevant factor, our consideration of that factor would be limited to the perception of an informed and objectively reasonable observer. Cf., e.g., Good News Club v. Milford Cent. Sch., No. 99-2036, --- U.S. ---, ---, 2001 WL 636202, at *11 (U.S. June 11, 2001) (rejecting subjective, speculative listeners' perception argument as "a modified heckler's veto, in which a group's religious activity can be proscribed

on the basis of what the youngest members of the audience might misperceive") (emphasis added); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in judgment) ("[T]he reasonable observer . . . must be deemed aware of the history and context of the community and forum in which the religious display appears. . . . Nor can the knowledge attributed to the reasonable observer be limited to the information gleaned simply from viewing the challenged display.") (emphasis added); Bauchman ex rel. Bauchman v. West High School, 132 F.3d 542, 555 (10th Cir. 1997) (attributing to reasonable observer knowledge of "the purpose, context and history of public education in Salt Lake City, including the historical tension between the government and the Mormon Church"). In this case, an informed, objectively reasonable observer would know the significance of the display's location on the City and County Building Steps; would know that Denver has erected this or a similar holiday display since at least 1979, see Citizens Concerned for the Separation of Church & State, 508 F. Supp. at 825; would view the size, content, and location of the Happy Holidays sign in the context of the display as a whole;[7] and would consider the fact that the sign's largely generic lettering is a far cry from the sophisticated graphic design generally associated

_____

[7] As shown by the Addendum to this opinion, the dissent's assertion that the Happy Holidays sign "appears to dominate one side of the display," infra at ___ [Dissent at 2] (emphasis added), is inaccurate. See Addendum, infra at __ [Op. at 41].

- 16 -

with commercial speech. Weighed against this knowledge, we cannot agree with the dissent's conclusion that the mere fact that the sign did not contain the words "Thank You" would lead a reasonable observer to conclude that the display was corporate speech. Having determined that the display constituted government speech, we turn now to the constitutional implications of that conclusion.

B. <u>Given that the Holiday Display Constitutes Government Speech, To What Extent Can Denver Control the Contents of the Display?</u>

"[W]hen the State is the speaker, it may make content-based choices." <u>Rosenberger</u>, 515 U.S. at 833. For example, the First Amendment does not bar the government from "mak[ing] a value judgment favoring childbirth over abortion," <u>Rust</u>, 500 U.S. at 192-92 (internal quotations and citations omitted), or from implementing that judgment by "refusing to fund activities, including speech," which relate to abortion. <u>Id.</u> at 194-95. Similarly, "[a]n arm of local government . . . may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives" by refusing to incorporate that speech into its own presentation. <u>Downs</u>, 228 F.3d at 1014; <u>see also</u> <u>Knights of the KKK</u>, 203 F.3d at 1094-95 (holding that government-owned radio station may control the contents of its own speech, but declining to decide whether governmental speech that is not editorial in nature is per se exempt from forum analysis).

- 17 -

Upon consideration, we conclude that the City of Denver is entitled to present a holiday message to its citizens without incurring a constitutional obligation to incorporate the message of any private party with something to say. "Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist." Downs, 228 F.3d at 1013. Although we recognize that "viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker," Velazquez, 121 S. Ct. at 1048, there is nothing in this record that supports the plaintiffs' assertion that the Winter Solstice sign was excluded from the display for viewpoint-based reasons. In fact, Mr. Hall testified that he had also denied an anonymous caller's request for permission to add a menorah to the 1999 display. Aplt. App. at 95, 104. We see no inconsistency between that denial and Mr. Hall's reluctance to rule out the possibility that he might consider an elected official's proposal that the City include a menorah in future displays. Id. at 108-09. Nor do we agree that the district court abused its discretion by sustaining the City's objection to a line of inquiry that called for speculation as to the possible content of future displays. Id. at 109.

In sum, we hold that the City acted within its rights to control the contents of its own speech. See, e.g., Muir, 688 F.2d at 1044 ("[T]he First Amendment does not preclude the government from exercising editorial control over its own

medium of expression.").

II.      Does Denver's Private Unattended Display Ban, Either on its Face or As Applied, Violate the Plaintiffs' First Amendment Rights to Freedom of Speech?

Plaintiffs' Winter Solstice sign was removed not only because it was "an intrusion into the display [the City] had erected," but also because "[i]t was an unattended display on the front [ i.e., East] steps of the City and County Building." Aplt. App. at 92. Although Denver permits demonstrations, rallies, picketing, leafleting, and similar speech activities on the City and County Building's interior sidewalks and -- absent a conflict with another event -- on the East Steps, the City does not permit private unattended displays on the steps. Id. at 89-92. Thus, whether speech is permissible or impermissible depends solely on its "manner," namely: whether or not the speaker is present. Id. at 91. As explained, we assess the regulation of private speech on government property according to a three-step analytical framework. Cornelius, 473 U.S. at 797; accord Mesa v. White, 197 F.3d 1041, 1044 (10th Cir. 1999); Summum v. Callaghan, 130 F.3d 906, 913 (10th Cir. 1997). Because the defendants have conceded that the Winter Solstice sign constitutes protected speech, Aplee. Br. at 12, our analysis begins with the second step: whether the property to which the plaintiffs seek access is a traditional public forum, a designated public forum, or a non-public forum. See Cornelius, 473 U.S. at 797; accord Summum, 130 F.3d at 913. This

- 19 -

characterization of the relevant forum is necessary to determine "the extent to which [Denver] may limit access to this property -- i.e., whether a heightened or reasonableness standard applies . . . ." Summum, 130 F.3d at 913 (citing Cornelius, 473 U.S. at 797). Third, "we must assess whether [Denver's] justifications . . . satisfy the requisite standard," id., in this case, whether the unattended display ban is narrowly tailored to further significant government interests, while leaving open ample alternative channels for communication. See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

A.     Public Forum Analysis

"[T]he Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998) (quoting Cornelius, 473 U.S. at 802) (alteration in original); accord Hawkins v. City & County of Denver, 170 F.3d 1281, 1286 (10th Cir.), cert. denied, 528 U.S. 871 (1999). In addition, certain government properties are "not fora at all." Forbes, 523 U.S. at 677 (citation omitted). Traditional public fora, such as public parks and sidewalks, are places that "by long tradition or by government fiat have been devoted to assembly and debate . . . ." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). Within a traditional public fora, the appropriate First Amendment standard depends on whether a restriction on speech

- 20 -

is content-based or content-neutral. Content-based restrictions must survive strict scrutiny -- i.e., they must be narrowly tailored to further a compelling governmental interest. Id.; see also United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000) (noting that under strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"). "On the other hand, we will uphold content-neutral time, place, and manner restrictions on speech provided they are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" Hawkins, 170 F.3d at 1286 (quoting Perry, 460 U.S. at 45) (emphasis added).

The second category of government property consists of designated public fora. "The designated public forum, whether of a limited or unlimited character, is one a state creates 'by intentionally opening a non-traditional forum for public discourse.'" Hawkins, 170 F.3d at 1286 (quoting Cornelius, 473 U.S. at 802); see also Forbes, 523 U.S. at 677 ("Designated public fora . . . are created by purposeful governmental action."). Designated public fora differ from traditional public fora in that "a State is not required to indefinitely retain the open character of the facility . . . ." Hawkins, 170 F.3d at 1287 (quoting Perry, 460 U.S. at 46); accord Summum, 130 F.3d at 914; see also DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 970 (9th Cir. 1999) ("The government has an

inherent right to control its property, which includes the right to close a previously open forum.") (citations omitted), cert. denied, 529 U.S. 1067 (2000). While a designated public forum remains open for public discourse, however, the government is subject to the same standards that apply in a traditional public forum. Perry, 460 U.S. at 46.

"Other government properties are either nonpublic fora or not fora at all." Forbes, 523 U.S. at 677 (citing Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678-79 (1992)). "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius, 473 U.S. at 806 (citing Perry, 460 U.S. at 49). A reasonable restriction "need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808.

### 1. Definition of Forum

Before we may properly characterize the forum at issue, we must first identify its boundaries. See id. at 801 ("[F]orum analysis is not completed merely by identifying the government property at issue"). To define the relevant forum, the Supreme Court has

> focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. In cases in which limited access is sought, [the Court's] cases have taken a more tailored approach to ascertaining the

> perimeters of a forum within the confines of the government property.

Id. (citation omitted). For example, the Cornelius Court defined the relevant forum as the federal fund-raising drive to which the plaintiffs sought access, rather than the federal workplace in general. Id.; see also Lebron v. Nat'l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 655-56 (2d Cir.) (defining forum as particular advertising space to which plaintiff sought access, rather than alternative space also owned by defendant), amended by 89 F.3d 39 (2d Cir. 1995); Texas v. Knights of the Ku Klux Klan, 58 F.3d 1075, 1078 (5th Cir. 1995) (defining forum as Adopt-a-Highway Program rather than public highways generally, where KKK sought permission to participate in Program near recently desegregated housing project). We recognize that Ms. Wells and the FFRF initially sought access only to the fenced-off area, Aplt. Add. at 9-12 (Pl. Ex. 11-12), and that they actually installed the Winter Solstice sign inside the fence. Id. at 2 (Pl. Ex. 4). Nonetheless, the record shows that for the purpose of Plaintiffs' "as applied" challenge to the unattended display ban, the relevant forum encompasses the entire East Steps, whether fenced-off or not. See Aplt. App. at 49 ("[W]e don't even want [the Winter Solstice sign] included in [Denver's] display. All we want to do is to have the right to post our sign unattended on the

steps . . . .") (statement by Plaintiffs' counsel at hearing) (emphasis added). [8]

### 2. Characterization of Forum

The parties disagree as to whether the relevant forum is a traditional or a designated public forum. See Aplt. Br. at 10 & n.3 (traditional); Aplee. Br. at 12-14 (designated). We find it unnecessary to resolve this dispute. As explained, the only distinction between the two types of public fora is that the government "is not required to indefinitely retain the open character" of a designated public forum. Perry, 460 U.S. at 46; accord Hawkins, 170 F.3d at 1287; Summum, 130 F.3d at 914. Since neither the plaintiffs nor the defendants claim that the unattended display ban has effectively closed the forum, the distinction between traditional and designated public fora has no practical significance in this case. E.g., Aplt. App. at 114 ("[T]he only difference between [a designated] and a traditional public forum . . . is that [a designated forum] can be canceled as a public forum if the City so chooses, but it hasn't so chosen, so it's a public forum.") (statement by Plaintiffs' counsel at hearing). As long as a public forum remains open, the government is subject to the same constitutional standards regardless of whether the forum is designated or traditional; the critical inquiry is content-neutrality.

---

[8] With respect to Plaintiffs' facial challenge to the unattended display ban, of course, our consideration is not limited to the East Steps, but includes all areas covered by the policy, i.e., the steps and interior sidewalks. See infra at __ [Op. at 33-35].

- 24 -

### 3. Content-Neutrality

In this case, the district court concluded that Denver did in fact have a policy prohibiting unattended displays, and that the policy was content-neutral. Aplt. App. at 139-40. We agree. The trial court based its finding on the testimony of Mr. Hall, and on the absence of any evidence to the contrary. Id. at 139-42. Despite the district court's exclusive reliance on testimonial evidence, "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Rankin v. McPherson, 483 U.S. 378, 386 n.9 (1987) (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-86 (1964))); see also Aplt. App. at 49 ("[T]his case probably can be decided without evidence . . . because it really is an issue of law. I don't think there is much factual dispute.") (comment by court). Thus, our review is de novo. Snyder v. Murray City Corp., 159 F.3d 1227, 1230 n.7 (10th Cir. 1998) (en banc).

Upon a careful review of the entire record, we agree that Denver does indeed have a policy that prohibits unattended displays on the East Steps, and we hold that this policy is content-neutral both on its face and as applied. As to the existence of the policy, Plaintiffs have presented no evidence to counter Mr.

Hall's testimony, given under oath, that Denver's unattended display ban has been in effect since at least 1985. Aplt. App. at 92, 97. Unlike the dissent, we cannot construe the City's failure to cite the unattended display ban in response to Plaintiffs' letters as evidence that no such policy existed. The record shows that both the 1998 letter and the 1999 letter specifically requested permission to place the Winter Solstice sign inside the fenced-off display. Aplt. Add. at 9 (Pl. Ex. 11) (1999 letter) (noticing intent "to place the [] sign inside this year's Christmas display area") (emphasis added); id. at 11 (Pl. Ex. 12) (1998 letter) (noticing intent to have the sign " included in the Christmas display") (emphasis added) . But cf. Aplt. Br. at 4 (stating that letters noticed Plaintiffs' "intention to place a display on the steps of the City and County Building"). We have already held that the City was not required to incorporate Plaintiffs' message into its holiday display. Accordingly, we cannot accept Plaintiffs' argument that the City's failure to cite the unattended display ban constitutes evidence that the ban was fabricated for the purpose of this litigation. Aplt. Br. at 12. [9] The same reasoning applies to the anonymous caller's request to add a menorah to the display – i.e.,

---

[9] The policy was not clearly implicated until the hearing on December 23, 1999, when Plaintiffs' counsel clarified: "we don't even want [the sign] included in [Denver's] display. All we want to do is to have the right to post our sign unattended on the steps of city hall." Aplt. App. at 49. But cf. id. at 13 (requesting, in Complaint, that the court order "Defendants to permit the Plaintiffs to display their sign unattended in the fenced-off area on the steps of Denver's City and County Building") (emphasis added).

inside the fence. Aplt. App. at 104. The City's failure to volunteer information –
either to Plaintiffs or to the anonymous caller – about an irrelevant policy is
probative of nothing.

B. Time-Place-Manner Restrictions

A content-neutral restriction in a traditional or designated public forum is
subject to review as a regulation on the time, place, and manner of speech. In a
time-place-manner analysis, the government must show that the regulation is
"narrowly tailored to serve a significant governmental interest, and that [it]
leave[s] open ample alternative channels for communication of the information."
Ward, 491 U.S. at 791 (internal quotations and citations omitted); see also Perry,
460 U.S. at 45. Applying this test, we conclude that Denver's unattended display
ban is constitutional .

1. Significant Governmental Interests

The analysis applicable to time-place-manner restrictions is more lenient
than strict scrutiny. First, the interests supporting a content-neutral
time-place-manner regulation need not be compelling, only significant or
substantial. See Ward, 491 U.S. at 796; cf. Playboy, 529 U.S. at 813 (noting that
content-based regulation must "promote a compelling Government interest"). The
City has asserted two interests supporting the unattended display ban: (1) keeping
the steps free of physical obstructions in order to enable access to the building,
particularly in the event that an emergency evacuation is necessary, and (2)

avoiding the burden of eventually disposing of displays left unattended.      See

Aplee. Br. at 14-15.

The Supreme Court has upheld a wide range of government interests as

sufficiently significant or substantial to justify a time-place-manner restriction.

E.g., Ward, 491 U.S. at 796 ("substantial interest in protecting . . . citizens from

unwelcome noise") (quotations and citations omitted);      Clark v. Cmty. for Creative

Non-Violence , 468 U.S. 288, 296 (1984) ("substantial interest in maintaining the

parks . . . in an attractive and intact condition").  In 1997, the Court held that the

government's asserted interests in ensuring public safety and order, promoting the

free flow of traffic on streets and sidewalks, protecting property rights, and

protecting a woman's freedom to seek pregnancy-related services, in combination,

were significant.   Schenck v. Pro-Choice Network   , 519 U.S. 357, 376 (1997).

The City's interest in avoiding the burden of disposing of unattended displays is

not supported by the record, but because the City's interest in facilitating building

access implicates public safety,    e.g., Aplt. App. at 91-92, that interest is

significant and substantial.    In light of our holding that the plaintiffs have no right

to add their sign to the City's display, their argument that a sign "placed well

inside the fenced-off area" would not constitute an obstruction is irrelevant.      See

Aplt. Br. at 10-11; Aplt. App. at 71, 101.

    2.    Narrowly Tailored

Second, unlike a restriction subject to strict scrutiny, a time-place-manner

regulation need not be the least restrictive means available in order to qualify as "narrowly tailored." Ward, 491 U.S. at 798 . In a time-place-manner case, "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," and does not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 799 (quotations and citations omitted, alteration in original). The permissive nature of the time-place-manner "narrowly tailored" requirement was most recently illustrated in Hill v. Colorado , 530 U.S. 703 (2000). In that case, the Court upheld a Colorado statute that created a floating "no-approach" zone around anyone within one hundred feet of the entrance to any health care facility. While acknowledging that the statute would sometimes operate to limit harmless speech, the Court concluded that "[a] bright-line prophylactic rule may be the best way to provide protection . . . ." Hill, 530 U.S. at 729. In light of this precedent, we must conclude that the unattended display ban is narrowly tailored. In the absence of the ban, Denver's asserted interests would certainly be "achieved less effectively," and there is no evidence that the ban restricts "substantially more speech than is necessary." Ward, 491 U.S. at 799; see also infra at __ [Op. at 30-31] (discussing alternative channels of communication).

        3.      Alternative Channels of Communication

The defendants presented undisputed testimony that the ban leaves speakers

with ample alternatives for communicating their message:

> Q:    [I]f I can summarize, you're saying that leafleting, demonstrations, picketing, and all other kinds of First Amendment activities where the speaker is present is available anywhere on the steps or in the interior sidewalk or the pedestrian sidewalk by the City and County Building?
>
> A.    That's correct.

Aplt. App. at 91 (direct examination of Mr. Hall); see also id. at 89-91. The plaintiffs' concern that "because of the controversial nature of the sign, confrontations would inevitably result thus jeopardizing [the sign holder's] physical safety" is irrelevant to their First Amendment rights. Aplt. Br. at 7; see also id. at 11 (noting Ms. Wells' concern that "if she is required to attend the sign, her personal safety would be put in danger from malcontents who might feel offended"). The First Amendment does prohibit the suppression of unpopular speech because of its content, but it does not require the government to serve as a speaker's proxy or bodyguard in order to enhance the strength of the speaker's message in the marketplace of ideas. See Regan v. Taxation With Representation of Wash., 461 U.S. 540, 549-50 (1983) ("[A]lthough government may not place obstacles in the path of a person's exercise of freedom of speech, it need not remove those not of its own creation.") (internal quotations, citation, and alterations omitted).

That said, we cannot ignore the fact that assault and menacing are illegal under Colorado law. See Colo. Rev. Stat. § 18-3-204 ("A person commits the

- 30 -

crime of assault in the third degree if he knowingly or recklessly causes bodily injury to another person . . . ."); Colo. Rev. Stat. § 18-3-206 ("A person commits the crime of menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury."); see also 18 U.S.C. § 241 (prohibiting conspiracies to interfere with exercise of a federal right, including the right to free speech). Our evaluation of whether the unattended display ban leaves Ms. Wells and the FFRF with sufficient alternative channels of communication must presume that people who view the sign will obey the law. In sum, we hold that Denver's ban on unattended private displays is a content-neutral regulation of the time, place, or manner – in this case, manner – of speech, and that it is therefore consistent with the First Amendment.

C.    Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753 (1995)

The plaintiffs are very critical of the district court's oral reference to Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753 (1995). See Aplt. Br. at 9. In Pinette, the Court held that the State does not violate the Establishment Clause when, pursuant to a content-neutral policy, it permits a private party to display an unattended cross in a traditional public forum. 515 U.S. at 770. The Court noted that a State could "impose reasonable, content-neutral time, place, and manner restrictions" in public fora, and noted in dicta that

"a ban on all unattended displays, which did not exist [in Pinette ], might be one such" restriction. Id. at 761. In this case, Ms. Wells and the FFRF claim that "the Court indulged in a strained and incorrect reading" of that dicta. Aplt. Br. at 9. Specifically, they allege that the court "erroneously construed Pinette " as overruling, by dicta, the Supreme Court's prior decisions in Ward and Perry . Aplt. Br. at 9. In addition, the plaintiffs object to the court's failure to explicitly conduct the time-place-manner analysis set out in Ward . Aplt. Br. at 8, 15. These arguments are unpersuasive.

First, it is well-established that "we are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." United States v. Sandia , 188 F.3d 1215, 1217 (10th Cir. 1999) (quotations and citation omitted). Upon de novo review, we conclude that the unattended display ban is a valid time-place-manner restriction, and the district court's discussion of the various opinions in Pinette hardly displaces our analysis. In any case, we find no error in the court's reference to Pinette . The relevant language in Justice Scalia's majority opinion -- joined, in pertinent part, by six other justices -- hypothesized that an unattended display ban "might be" an example of a valid time-place-manner restriction. Pinette , 515 U.S. at 761. [10] The district court in

_____

[10] The language in Justice Souter's concurring and Justice Stevens'
(continued...)

this case consistently referred to the relevant language as dicta.   E.g., Aplt. App. at 116 (" Capitol Square  indicates there can be a ban on all unattended displays.  It did not occur in that case, so it's    dicta . . . ."); see also id. at 137-138.  Taking the Pinette Court's suggestion as a starting point, the court then concluded that the policy before it was, in fact, a valid time-place-manner restriction.  In our view, the court did conduct a time-place-manner analysis, despite its failure to say whatever magic words the plaintiffs were looking for.

D.    Facial Challenge to the Unattended Display Ban: Unbridled Discretion

Plaintiffs also challenge the unattended display ban on its face, claiming that the prohibition is a per se violation of the First Amendment in that it vests unbridled discretion in city officials.    "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."    City of Lakewood v. Plain Dealer Pub. Co.  , 486 U.S. 750, 757 (1988)   (citations omitted); see also, e.g.  , Police Dep't of Chicago v. Mosley  , 408 U.S. 92, 97 (1972);

---

[10](...continued)
dissenting opinions is more definitive, but that language did not carry a majority of the Court.   Id. at 783-84 (Souter, J., concurring in part and concurring in the judgment) ("The fact that the capitol lawn has been the site of public protests and gatherings, and is the location of any number of the government's own unattended displays . . .  does not disable the State from closing the square to all privately owned, unattended structures  .") (emphasis added);  id. at 803 (Stevens, J., dissenting) (noting that "a   State may impose a ban on all private unattended displays in [] a [public] forum  ") (emphasis added).

Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-53 (1969); Poulos v. New Hampshire, 345 U.S. 395, 407 (1953). As a preliminary matter, we note that the fact that Denver's policy is unwritten is not fatal, but merely a factor to be considered. Lebron, 69 F.3d at 658 ("The fact that a policy is not committed to writing does not of itself constitute a First Amendment violation.").

In addition, the record indicates that the unattended display ban leaves very little room for official discretion -- if any. E.g., Aplt. App. at 97, 107 (testifying that there are no exceptions to the unattended display ban) (Mr. Hall). To counter this evidence, Ms. Wells and the FFRF note that in the wake of the Columbine High School shooting in April 1999, the mayor allowed "signs, cards, stuffed animals, and other paraphe[r]nalia [that] were taped to the sidewalk and the fence below the steps" by mourners to remain unattended for ten to fourteen days. Aplt. Br. at 15; see also Aplt. App. at 73. There is no other evidence that the City has permitted private, unattended displays at the City and County Building, and there is no evidence that the City has ever permitted such displays on the East Steps. Aplt. App. at 77, 93-94, 97, 107.

Even if we assume that the Columbine displays constitute evidence that the policy allows official discretion, we find that discretion is sufficiently bounded to survive constitutional scrutiny. The unbridled discretion doctrine requires that official discretion affecting First Amendment interests be bounded by limits that are "made explicit by textual incorporation, binding judicial or administrative

- 34 -

construction, or well-established practice ." City of Lakewood , 486 U.S. at 770 (citations omitted, emphasis added). In this case, Denver's "well-established practice" with respect to the unattended display ban appears to be one of uniform enforcement, with the sole exception of the Columbine displays. As discussed below, the events surrounding the Columbine displays were extraordinarily tragic and highly emotional. Neither City of Lakewood nor any other unbridled discretion case supports the proposition that a single, unique exception to a generally applicable and otherwise uniformly enforced policy is sufficient to render that policy constitutionally void. Accordingly, we must reject the plaintiffs' claim that the City's discretion is unfettered.

E.    As Applied Challenge to the Unattended Display Ban: Selective Enforcement

As to the application of the policy, Plaintiffs have presented no probative evidence to counter Mr. Hall's testimony that the policy is and always has been enforced in a uniform, non-discriminatory manner, without regard to content or viewpoint. Aplt. App. at 92-93, 97, 107. We have given careful consideration to the Columbine displays, see Aplt. App. at 73, 77, 92-93, 97; Aplt. Add. at 5-8 (Pl. Ex. 7-10), taking judicial notice of the facts surrounding those displays, see Fed. R. Evid. 201(b), (c), and we conclude that the plaintiffs' selective enforcement claim is not supported by the record. On April 20, 1999, two masked gunmen opened fire on their fellow students at Columbine High School in Littleton,

Colorado. The shooters murdered thirteen high school students, then killed themselves. An additional twenty-three students were hospitalized, twenty-one with gunshot wounds. On April 21-22, 1999, the City of Denver sponsored a memorial event in Civic Center Park, which is across the street from the City and County Building at issue in this appeal. Aplt. App. at 93 . Simultaneous with that event, grieving citizens left various items in the nature of teddy bears, flowers, and notes on the interior sidewalks surrounding the East Steps in order to express solidarity with the victims and their families. Aplt. Add. at 5-8 (Pl. Ex. 7-10).

Despite the unattended display ban, which applies to the interior sidewalks as well as the East Steps, Mayor Webb elected to postpone removing those items for ten to fourteen days. Aplt. App. at 73, 97. According to Mr. Hall, the mayor's decision was based on "the particularly tragic nature of that event, the heinous nature of the crime, and simply the outpouring of sympathy" from Denver's community. Id. at 93 . Like the district court, we believe that the Columbine shooting was so unique and so extraordinarily horrific that the mayor's decision not to remove the mourners' teddy bears and flowers is simply not probative as to the general operation of the unattended display ban. See id. at 140 ("I can't really give weight to [the Columbine displays] as some evidence that there is no policy, because that was a totally unique situation. That was a situation which never arose before and probably hopefully never will arise again.") (statement by court). On direct examination, even Ms. Wells expressed

doubts as to whether the Columbine display was properly described as "an exception to their policy [concerning] unattended displays . . . ." Id. at 73.

We must also reject Plaintiffs' contention that the district court erroneously denied them the opportunity to develop a complete factual record on the issue of selective enforcement. Aplt. Br. at 14. At the hearing on Plaintiffs' motion for preliminary injunctive relief, the City objected to the following question, posed to Mr. Hall: "You think the Columbine situation is more important than Ms. Wells' sign?" Aplt. App. at 98. The court sustained the objection on the grounds that the question was not only argumentative, but also irrelevant in that it asked the "witness his personal views about which is more important." Id. at 99. We see no abuse of discretion in the court's ruling.

III.  Free Exercise, Establishment Clause and Equal Protection Challenges

Plaintiffs' remaining constitutional arguments are somewhat elusive. The underlying premise for all three challenges is that the Winter Solstice sign is "religious in the sense that atheism is a belief system that competes with theistic religions . . . ." Aplt. Br. at 20. Plaintiffs cite no legal authority for this proposition, but as we did in Otero v. State Election Bd. of Okla., 975 F.2d 738, 740 (10th Cir. 1992), we will assume, without deciding, that atheism is a religion for First Amendment purposes. Next, the plaintiffs claim that:

> By keeping [the Winter Solstice] sign off the steps of City [sic] and
> by imposing . . . restrictions on it that do not apply to the creche
> [presumably, the unattended display ban], the City is preferring

> Christianity over non-religion and theism over atheism. This abridges Wells' right . . . to free exercise of her religious beliefs under the First Amendment and is a denial of equal protection under the Fourteenth Amendment. It is also an unconstitutional establishment of religion under the First Amendment because it violates the second prong [of] the    Lemon test . . . .

Aplt. Br. at 20-21 (footnote omitted);    cf. Lemon v. Kurtzman  , 403 U.S. 602, 612-13 (1971) (articulating three-part test for Establishment Clause challenges: first, the governmental action at issue "must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, [it] must not foster an excessive government entanglement with religion") (internal quotations and citations omitted). Beyond    Lemon , Plaintiffs cite no legal authority for these assertions.

Because the challenged policies are both generally applicable and neutral as to religion, the free exercise claims must fail.    See Shaffer v. Saffle  , 148 F.3d 1180, 1181-82 (10th Cir. 1998) (holding that religion-neutral law that is generally applicable does not violate Free Exercise Clause, despite incidental effect on religious practice);    accord Employment Div., Dep't of Human Resources v. Smith , 494 U.S. 872, 878-79 (1990). The plaintiffs' claims under the Establishment Clause are also unavailing. As to the exclusion of the Winter Solstice sign from the City's display, we find the reasoning employed by    Citizens Concerned for Separation of Church & State v. City & County of Denver    , 508 F. Supp. 823 (D. Colo. 1981),    aff'd , No. 82-1022 (10th Cir. May 14, 1984)

(unpublished order), to be persuasive. See supra note 3. The fact that the present plaintiffs seek to add to the City's display, rather than to dismantle it, makes no difference to the Establishment Clause analysis. Cf. Snyder, 159 F.3d at 1233 (rejecting Establishment Clause claim by individual seeking "equal public access to a legislative body's program of invocational prayers"). With respect to the unattended display ban, Plaintiffs fail on each prong of the Lemon test. [11] As explained in our discussion of the significant governmental interests supporting the policy, see supra at __ [Op. at 27-29], the unattended display ban has a secular purpose. Cf. Lemon, 403 U.S. at 612. There is no evidence that the policy's "principal or primary effect" either "advances [or] inhibits religion," id. (citation omitted), nor does it "foster an excessive government entanglement with religion." Id. at 613 (internal quotations and citation omitted).

Plaintiffs' equal protection claims are also without merit. Contrary to Plaintiffs' characterization, the display, including the Happy Holidays sign, is the City's speech. As explained, the plaintiffs have no First Amendment rights to dictate the content of that speech. Thus, there is no evidence that the plaintiffs

---

[11] The dissent concedes "that a content-neutral policy banning all unattended displays would pass the Lemon test," but concludes that no such policy exists in this case. Infra at __ [Dissent at 6]. Given our conclusion that Denver does have a content-neutral unattended display ban, we need not address the dissent's analysis under Lemon, nor is it necessary to respond to the dissent's rhetoric regarding the implications of Mr. Hall's brief conversation with an anonymous caller. See infra at __ [Dissent at 7-8].

have been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (citations omitted).  Without such evidence, the equal protection claim must fail.  Nor is there any evidence that similarly situated persons were subject to differential treatment with respect to the unattended display ban.  As noted in our discussion of the plaintiffs' selective enforcement claim, the Columbine mourners were not similarly situated.  <u>See</u> <u>supra</u> at __ [Op. at 35-37].

For the foregoing reasons, the district court's judgment is AFFIRMED.



Aplee. Supp. App. at 2 (Def. Ex. C).



Aplt. Add. at 2 (Pl. Ex. 3).

**No. 00-1040, <u>Wells v. City & County of Denver</u>**

**BRISCOE, Circuit Judge, dissenting:**

I respectfully dissent from the majority opinion. First, I disagree with the conclusion that the display on the Denver steps is solely government speech. Second, I disagree with the conclusion that Denver has a neutral policy of banning all unattended displays from the steps. Third, I disagree with the majority's analysis of the Establishment Clause issue.

<u>Standard of Review</u>

In a First Amendment case, this court performs an independent examination of the record to ensure protection of free speech rights. <u>Hawkins v. City & County of Denver</u>, 170 F.3d 1281, 1285 (10th Cir.), <u>cert. denied</u>, 528 U.S. 871 (1999). "In cases involving the First Amendment, the de novo standard is appropriate. . . . [A]n appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." <u>Horstkoetter v. Dep't of Pub. Safety</u>, 159 F.3d 1265, 1270 (10th Cir. 1998) (internal quotations omitted).

<u>Government Speech</u>

The majority concludes that the display on the steps is government speech rather than private speech. This conclusion is significant because "when the State is the speaker, it may make content-based choices." <u>Rosenberger v. Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819, 833 (1995). I agree with Wells that the holiday display is not solely

government speech, but contains private speech, because it includes a billboard which states:

| HAPPY HOLIDAYS<br>FROM THE<br>Keep the Lights Foundation<br>and the sponsors that<br>help maintain the lights at the<br>City and County Building | News 4<br>Spirit of Colorado<br>Coors Light<br>King Soopers • AAA of Colorado<br>Denver Rocky Mountain News<br>Rock Bottom Brewery |
| --- | --- |

Maj. Op. Add.   This large billboard is the only sign evident from the photos of the display  included in the record  and it appears to dominate  one side of the display.  See id.

The majority states that the billboard with the list of sponsors is a thank you from the city to the sponsors, making it government speech.  However, the language of the billboard is not phrased as a thank you from Denver to the sponsors.  Rather, it is a greeting from the sponsors to the public.  To a passerby, the billboard does not appear to be from Denver, but from the sponsors, all of whom are private entities.  The billboard shows that those private corporations have co-sponsored the holiday display, also making the display their speech as well as Denver's speech.

In determining this is government speech, the majority relies on the four-factor "test" in Knights of Ku Klux Klan v. Curators of University of Missouri, 203 F.3d 1085 (8th Cir. 2000).  However, it is not clear whether the court in Knights of KKK was creating a test to be applied in all government speech cases, or whether it was identifying the factors that evidenced government speech in that case.  See id. at 1093-94.  An

- 2 -

additional factor relevant to the inquiry is who the listener believes to be the speaker.  See

id. at 1094 n.9 (differentiating the underwriting announcements from letters to the editor

because the letters "are more obviously the speech of the writer, not the government").

In Knights of KKK, it was clear that the government was speaking.  See id.  at

1093-94.  Similarly, in Downs v. Los Angeles Unified School District, 228 F.3d 1003,

1009-11 (9th Cir. 2000), it was clear to the reader that the bulletin board constituted

government speech, as presented by a state-employed teacher.  In the present case, it is

not clear *to the reader/listener* that the government, rather than the sponsors, is the

speaker.  All of the factors identified by the majority (purpose of the sign, who paid for

and built the sign, legal responsibility of the display) address who is actually responsible

for the message on the sign.  While I agree that Denver owns and controls the sign, there

is no way for the casual reader/listener to know this.  To a passerby, the sign and the

message are from a group of private organizations, and the holiday display is at least in

part their speech.  I dissent from the majority holding that the display is government

speech.

Neutral Policy

The majority also concludes that Denver has a content-neutral policy of banning all

unattended displays from the steps.  Because the steps are either a traditional or a

designated forum, such a policy would be a constitutional time, place, and manner

restriction.  See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761,

783-84 (Souter, J. concurring), 803 (Stevens, J. dissenting) (1995). However, I disagree with the conclusion that Denver has such a policy.

John Hall testified that private unattended displays are not permitted on the steps or the interior sidewalk and that this unwritten policy had been in place since at least 1985. However, on the two occasions that Wells requested information about the need for a permit related to her sign, she was not told of such a policy. An anonymous caller inquiring about adding a menorah to the holiday display was not told about this policy. Following the Columbine tragedy, a display of cards, flowers, and stuffed animals remained on the interior sidewalk in front of the steps of the building for over ten days. Further, the annual Christmas display is itself an exception to the policy, as it is replete with unattended displays and signs.

The majority states that the fact that the policy was not identified to Wells or the anonymous caller does not mean it does not exist, and that the Columbine display was a one-time exception. However, Denver's failure to enforce the policy consistently should come under very close scrutiny. See Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 816 (1984) ("To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination."). If Denver is permitted to make exceptions to its policy that private unattended displays are not permitted on the steps or interior sidewalk, or if Denver is permitted to make these exceptions without any

- 4 -

established standards, it has the sort of unbridled discretion that permits viewpoint discrimination and violates the First Amendment. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 84 (1981) (Stevens, J., concurring) ("[M]unicipalities may regulate expressive activity--even protected activity--pursuant to narrowly drawn content-neutral standards; however, they may not regulate protected activity when the only standard provided is the unbridled discretion of a municipal official."). The majority reasons that the discretion is not unbridled because it has been exercised only for the Columbine tragedy. However, there is no indication that the policy was enforced prior to Wells' request, only that the policy existed. Further, the fact that Denver has not exercised its discretion to permit an exception to its policy on numerous occasions does not make the exercise of its discretion any less unbridled. There are no clear restrictions on the City's discretion or established standards which would in any way restrict the City when granting an exception to its policy banning unattended displays.

Because the policy of disallowing unattended displays from the steps is unwritten and subject to exceptions for which there are no standards, the policy is not a content-neutral time, place, and manner restriction, and it does not pass constitutional muster.

<u>Establishment Clause</u>

The majority concludes there is no Establishment Clause violation because we previously have found the Denver display to be constitutional and because the unattended display ban passes the test created in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971). I disagree.

The case of <u>Citizens Concerned for Separation of Church & State v. City & County of Denver</u>, 508 F. Supp. 823 (D. Colo. 1981), <u>aff'd</u>, No. 82-1022 (10th Cir. May 14, 1984) (unpublished order), is not persuasive or controlling authority for the resolution of the Establishment Clause issue presented. <u>Citizens</u> dealt with the question of whether the display's inclusion of a creche was unconstitutional. It did not address the question of whether including a creche while excluding other religious messages was constitutional. This court has not addressed the question of exclusion of religious messages from holiday displays.

I agree with the majority that a content-neutral policy banning all unattended displays would pass the <u>Lemon</u> test. However, because such a policy does not exist here, I would apply the <u>Lemon</u> test to the decision to exclude Wells' sign, rather than any alleged policy to ban all unattended displays. Under the <u>Lemon</u> test, the statute or action must have a secular purpose, the primary or principal effect must neither advance nor inhibit religion, and it must not foster excessive government entanglement with religion. <u>Lemon</u>, 403 U.S. at 612-13.

Under Lemon, the first question is whether the decision to prohibit Wells' sign has a secular purpose. Denver argues that its purpose in prohibiting the sign is to keep the steps from being blocked. However, this justification is meaningless since Wells proposed putting the sign within the fenced-off display which Denver already had located on the steps. Denver has not identified any other secular reason for its decision.

Under Lemon, the second question is whether the principal or primary effect is one that neither advances nor inhibits religion. In Conrad v. City & County of Denver, 724 P.2d 1309, 1316 (Colo. 1986), the court held that the holiday display's primary effect was not to advance or inhibit religion. However, the court noted that the presence of a nativity scene may have the remote and incidental effect of advancing religion.

Hall testified that when an anonymous caller asked if she could put a menorah in the holiday display, Hall told her that she could not. Thus, Denver has taken the position that, as regards religious items, only items pertaining to the holiday of Christmas are welcome in its display. Wells' sign, like the menorah, represents an alternative religious perspective that Denver has opted to exclude from its display. The decision to exclude Wells' sign and a menorah from the display sends the message that Denver supports Christianity and does not support other religions or religious viewpoints. When the City creates that impression, it violates the Establishment Clause. Because the decision to allow only Christian symbols in the display and to prohibit other religious perspectives has the primary effect of promoting or inhibiting religion, Denver's decision fails the

second prong of the <u>Lemon</u> test.

Under <u>Lemon</u>, the third question is whether the decision fosters excessive government entanglement with religion. To determine this question, we are required to inquire as to whether there is excessive administrative entanglement and whether the government action causes continuing political strife over aid to religion. <u>Conrad</u>, 724 P.2d at 1316. The answer to both of these questions is no. The only administrative responsibilities involved are to deny the requests of all persons who wish to have their non-Christian religion represented in the display. This is not complicated and has not taken much administrative time. The only political strife that exists is caused by litigation such as the present case. A plaintiff cannot create strife by litigating and then arguing that the policy causes strife. Therefore, Denver's decision passes the third prong of the <u>Lemon</u> test.

Because the decision to exclude Wells' sign violates the first two prongs of the <u>Lemon</u> test, I dissent from the opinion's holding that there is no basis for concluding there is an Establishment Clause violation established in the present case.

I would reverse the district court's dismissal of Wells' claims and remand for further proceedings.