CIMARRON ALLIANCE FOUNDA-
TION, an Oklahoma Corpora-
tion, Plaintiff,

v.

THE CITY OF OKLAHOMA CITY,
OKLAHOMA, an Oklahoma Munici-
pal Corporation; et al., Defendants.

No. CIV–01–1827–C.

United States District Court,
W.D. Oklahoma.

Sept. 13, 2002.

marron Alliance Foundation, an Oklahoma Corporation, Plaintiff.

Richard C Smith, Municipal Counselor's Office–OKC, Tina A Hughes, Municipal Counselor's Office–OKC, Oklahoma City, OK, for Oklahoma City, City of, an Oklahoma Municipal Corporation, James C Couch, in his official capacity as City Manager of the City of Oklahoma City, Oklahoma, Defendants.

## ORDER

CAUTHRON, Chief Judge.

Before the Court for consideration are cross-motions for summary judgment submitted by the parties, Plaintiff Cimarron Alliance Foundation ("CAF") and Defendants City of Oklahoma City, Oklahoma ("Oklahoma City"), and James D. Couch in his individual capacity and official capacity as City Manager of Oklahoma City, Oklahoma ("Couch").[1] The matter is now at issue.

### I. STATEMENT OF THE CASE

In 1988 and 1989, in preparation and support for the Olympic Festival activities, Oklahoma City selected various utility poles across the city to be used for the display of banners. Supports, or braces that would be used to hold the banners, were placed on more than 1,000 utility poles across the city. The utility poles are located on sidewalks, streets, center medians and other areas around the city. A majority of the poles on which the banner supports were placed are owned by Oklahoma Gas & Electric Company ("OG & E"). Since 1989 and prior to passage of the new banner ordinance, the office of the Chief Traffic Engineer was in charge of approving banner applications. During

Mark L Henricksen, Henricksen & Henricksen, El Reno, OK, Micheal C Salem, Salem Law Office, Norman, OK, for Ci-

1. Where appropriate, both Defendants Oklahoma City and Couch will be collectively referred to as "Defendants."

that time, no completed banner application was rejected.

In the spring of 2001, a "banner review committee" approved banner applications submitted by CAF for the Gay and Lesbian Pride Parade, which was to occur in June 2001. The allotted time period for the CAF banners was from May 22, 2001, to July 10, 2001. CAF banners were displayed along the parade route. After the banners were posted, Oklahoma City officials, including Couch, began receiving calls from the general public, criticizing the presence of the banners. After the calls began, Oklahoma City Mayor Kirk Humphreys ("Humphreys") contacted Couch to find out what Oklahoma City's policy was concerning banner displays. When informed by Couch that there was no set policy, Humphreys encouraged Couch to develop one.

Claiming he had a mistaken belief that CAF's permission to display the banners ended when the parade ended, Couch ordered the banners taken down. Couch also felt that removal of the banners would quell the controversy surrounding the banners' content. After the banners were taken down and replaced, CAF's counsel sent Couch a letter threatening legal action if the banners were not put up for the rest of the remaining time period. Couch subsequently ordered the banners to be put back up at their original locations.

On August 28, 2001, the City Council adopted a new banner ordinance.[2] CAF and an organization called "The Peace House" subsequently applied for the posting of banners for the 15th Annual Gay and Lesbian Pride Parade from June 1 to June 24, 2002. The application was rejected on the grounds that under the new ordinance, the banners promoted "social

---

**2.** Relevant provisions of the new ordinance, Chapter 3, art. V of the Oklahoma City Municipal Code, Revised (2001) reads as follows:
§ 3–83: *General regulations for all signs.*
(a) General prohibitions.
    \*     \*     \*     \*     \*     \*
(3) The use of any boulevard, street, parkway, park road, or park under the control of the city for any political, social, civic or charitable [non-accessory] advertising purpose within full view of those traveling on a public road is prohibited; provided that the governmental use of these areas to display public information, and banners ...shall not be included in this restriction.
    \*     \*     \*     \*     \*     \*
§ 3–180. *Generally.*
The City Manager or his designee may accept donations of decorative banners or other decorations designed to be placed on light poles... The City may use light poles to display donated banners, or any other city-owned or controlled banners, that the City Manager or his designee determines will promote or celebrate the City ... and that he or she finds will otherwise promote the corporate interests and welfare of [the City]. No commercial

banners or decorations will be accepted for display on City light poles, *nor will the City accept or display banners promoting any political, religious or social advocacy organization or any political, religious or social advocacy message.*
§ 3–181. *Definitions.*
    \*     \*     \*     \*     \*     \*
(2) *Commercial banner or decoration* means those banners ... the sole or chief purpose of which is to advertise ... the distribution [or sale] of goods and or services [except for those] which are strongly vested with public importance, such as *utility, education, recreational, cultural, [and] medical* ...
(4) *Social advocacy message* means any communication in writing, in speech, or by signals which promotes, advocates or supports common behavior and/or beliefs among the general citizenry or any subgroup thereof.
(5) *Social advocacy organization* means any group or associations whose purpose it is to promote, advocate or support common behavior and/or beliefs among the general citizenry or any subgroup thereof.
(Emphasis added).

advocacy." As a result of the initial removal of the banners in 2001 and the denial of the banner applications in 2002, this litigation has ensued.

## II. STANDARD OF REVIEW

The summary judgment standard the Court must apply is well established. Summary judgment may only be granted if the evidence of record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The substantive law giving rise to the underlying claim informs the Court as to which facts are material and for which there must be a genuine dispute. *Occusafe, Inc. v. EG&G Rocky Flats, Inc.,* 54 F.3d 618 (10th Cir.1995). On summary judgment, the Court must view the evidence of record in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Occusafe,* 54 F.3d at 621. However, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## III. DISCUSSION

When a government official is sued in both his individual and official capacities for acts performed in each capacity, those acts "are generally treated as the transactions of two different legal personages." *Bender v. Williamsport Area School District,* 475 U.S. 534, 543 n. 6, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), *quoting* F. James & G. Hazard, *Civil Procedure* § 11.6, p. 594 (3d ed.1985). Thus, a person sued in his official capacity has no stake, individually, in the outcome of the litigation. *Bender,*

475 U.S. at 543–44, 106 S.Ct. 1326. Personal or individual capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In CAF's complaint, it names Couch as a Defendant in both his individual and official capacities. However, CAF does not seek any damages from Couch in his individual capacity; it only seeks equitable relief (injunction) against Couch as City Manager.[3] As all relief requested against Couch is available against him only in his official capacity, *see Johnson v. Board of County Commissioners,* 85 F.3d 489, 493 (10th Cir.1996), CAF's complaint as to Defendant Couch in his individual capacity is DISMISSED. The Court shall now address the cross-motions for summary judgment between CAF and Oklahoma City and Couch in his official capacity.

CAF sues under 42 U.S.C. § 1983 for violations of its First Amendment rights. CAF argues the removal of its banners and subsequent denial of the 2002 application amount to an unconstitutional content and viewpoint-based restriction of its right to freedom of speech. Oklahoma City and Couch present two arguments: First, that the banner displays constitute government speech; therefore, it is permissible for Oklahoma City to engage in viewpoint and content-based regulation of what is displayed on them, and secondly, a utility pole is a non-public forum.

## A. WHETHER OKLAHOMA CITY'S BANNER PROGRAM IS GOVERNMENT SPEECH.

■ The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." This provision

---

**3.** *See* Plaintiff's Complaint, at ¶¶ 39–42; *see also* Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 1 fn. 1.

embodies "[o]ur profound national commitment to the free exchange of ideas." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). "[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content'" *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (*quoting Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). The First Amendment is made applicable to the states by virtue of the Fourteenth Amendment. *See Miller v. California,* 413 U.S. 15, 44, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). However, when the government speaks, either directly or through private intermediaries, it is constitutionally entitled to make content-based decisions. *Wells v. City & County of Denver,* 257 F.3d 1132, 1139 (10th Cir.), *cert. denied,* 534 U.S. 997, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001). Therefore, a court's analysis of restrictions that arise in the context of government speech is different from the analysis concerning private speech. *Id.*

■ No clear standard has been adopted by the United States Supreme Court for determining when the government is "speaking" and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so. In light of this dilemma, in deciding whether an expression is government speech, the Tenth Circuit Court of Appeals has adopted and considers four factors: (1) whether the central purpose of the speech is to promote the views of the municipality; (2) whether the municipality exercised editorial control over the content of the speech; (3) whether the literal speaker was an employee of the municipality; and (4) whether ultimate responsibility for the content of the speech rested with the government. *Summum v. City of*

*Ogden,* 297 F.3d 995, 1004–05 (10th Cir. 2002); 2002 U.S.App. LEXIS 14636 * 20 (10th Cir., July 19, 2002), *citing Wells, supra.* Accordingly, examination of those factors in this context, in conjunction with consideration of applicable Supreme Court precedent, resolves the government speech issue before this Court.

### 1. Whether the Central Purpose of the Speech Is to Promote the Views of the Municipality

■ While the purpose of a government program or subsidy that implicates speech interests will at times be apparent, *see Wells,* 257 F.3d at 1141 (citing evidence that the purpose of the sign asserted to be government speech was to "thank the sponsors and the citizens for the support of the cost of the display"), this is not the case here. It is undisputed that prior to the new ordinance the purpose of the banner program was to beautify the community, inform the public about area events, and to promote programs important to the City's image. After the passage of the ordinance, the purpose is to promote or celebrate the City or otherwise promote its corporate interests and welfare. Either way, the program allows private donors to express their messages or goals.

In applying the first factor, the *Wells* court cited to the fact that the City of Denver exercised complete control over the sign's construction, message and placement. *Id.* Applying the first *Wells* factor to the present case, this Court finds that the central purpose of the speech is to promote the views of the private donor, not the municipality. It is the private donor who exercises complete control of the sign: its design, size, message, color scheme, placement, etc. Oklahoma City's participation in the banner process is to review the banner to check if it is inconsistent with the purpose of the banner display. Oklahoma City's approval of the banner does not transform the private

speech into that of the government. *Cf.* *Summum,* 297 F.3d at 1005, 2002 U.S.App. LEXIS 14636 at * 24.

### 2. Whether the Municipality Exercised Editorial Control Over the Content of the Speech

The term "edit" is defined by Webster's Dictionary as "**1 a:** to prepare (as literary material) for publication or public presentation **b:** to assemble (as a moving picture or tape recording) by cutting and rearranging **c:** to alter, adapt, or refine especially to bring about conformity to a standard or to suit a particular purpose." Webster's Collegiate Dictionary, at www.m-w.com. It can hardly be said that Oklahoma City exercises editorial control over the content of the banners. Oklahoma City does not build, pay for, or otherwise construct the banners. *Wells,* 257 F.3d at 1142. The private donor creates the sign and turns over to Oklahoma City a completed product. *Summum,* 297 F.3d at 1004, 2002 U.S.App. LEXIS at * 21–22. Oklahoma City's sole function in relation to the banners is seeing if they promote the corporate interests of the city. If the signs do not promote such interests, they are rejected. Oklahoma City's *regulatory* discretion (deciding whether to display the banner) should not be confused with *editorial* discretion (deciding what message the banner will convey). Therefore, the Court finds that Oklahoma City has no editorial control over the content of the banners.

### 3. Whether the Literal Speaker Was an Employee of the Municipality.

In *Summum,* the court noted that the mode of speech clearly acknowledged the private individual as its creator. *Summum,* 297 F.3d at 1004, 2002 U.S.App. LEXIS at * 22. Here, it is obvious that no employee of Oklahoma City is the "literal speaker" of the message found in the banners. In this case, the banners clearly displayed CAF's logo on them, as well as that of a sponsor; there is nothing which portrays the name of Oklahoma City on them. For instance, a different conclusion would be warranted if the banners stated somewhere "Sponsored by the City of Oklahoma City." However, that is not the case here.

Furthermore, the *Summum* court concluded that the donor was in fact the literal speaker because it composed the speech contained on the monument free from government control. *Summum,* 297 F.3d at 1004–05, 2002 U.S.App. LEXIS at * 22–23. As stated, although Defendant Oklahoma City controls what banners are to be displayed, it does not decide the content. Oklahoma City has come forward with no evidence that shows it exercises discretion as to the content of the banners. Therefore, no employee of Oklahoma City is the literal speaker of the messages.

### 4. Whether Ultimate Responsibility of the Content of the Speech Rested with the Government.

In *Summum,* the court noted the fact that once the city took possession of the particular mode of speech, it could then presumably do whatever it wanted with it (sell, regift, modify, or destroy it). This, the *Summum* court held, may raise a presumption that the city bore the ultimately responsibility for the content of the speech. *Id.* at 1004–05, 2002 U.S.App. LEXIS at * 23. Here, the donor pays the cost of the design and production of the banners. Furthermore, the donor is responsible for the repair or replacement of all banners that are damaged or destroyed. All banners that are removed will be stored at the donor's location. These facts are undisputed [4] (*See* Plaintiff's Motion at

---

4. The parties do not state in their briefs, nor can the Court find, any information on how the banners were treated *prior* to the 2002 ordinance's enactment.

6–7; Defendants' Response to Plaintiff's Motion at 4). In *Wells,* the court noted that the city provided security for the display, including a fence, video cameras, and a security guard. *Wells,* 257 F.3d at 1142. Although such precautionary measures are not warranted here, it is clear from the evidence before this Court that Oklahoma City does not possess any responsibility other than approval for posting.

Therefore, in light of the four *Wells* factors, this Court finds that the banner displays are not government speech.

## B. WHETHER THE UTILITY POLES UPON WHICH THE BANNERS ARE DISPLAYED CONSTITUTE A PUBLIC FORUM.

Under federal constitutional jurisprudence, the analysis of a governmentally imposed restriction of speech begins with an inquiry into the nature of the property affected by the regulation. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). "[T]he public forum issue is ... central to determining whether speech on [government property] can constitutionally be regulated." *Brown v. Palmer,* 915 F.2d 1435, 1441 (10th Cir. 1990). In *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court articulated three categories of public forums: traditional, designated, and remaining public property. The first category, traditional public forum, includes places which " 'have immemorially been held in trust for the use of the public, and ... have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Perry,* 460 U.S. at 45, 103 S.Ct. 948 (*quoting Hague v. Committee for Industrial Organization,* 307 U.S. 496, 514, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Thus, a place such as a street, sidewalk, or park is considered to be, without more, a public forum. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

■ In a traditional public forum, content-neutral restrictions of free speech are considered reasonable time, place, and manner regulations if they are narrowly tailored to achieve a significant government interest, and leave open ample alternative channels of communication. *Grace,* 461 U.S. at 177, 103 S.Ct. 1702. Restrictions affecting a traditional public forum that are not content neutral, however, must be necessary to achieve a compelling state interest and must be narrowly drawn to achieve that end. *Perry,* 460 U.S. at 45, 103 S.Ct. 948.

■ The second category articulated in *Perry,* the designated public forum, consists of government property that has been opened to the public as a place for expressive activity. *Id.* Whether a forum has been designated for expressive activity is determined by the government's intent in establishing the forum. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. The subcategory of the designated forum, "the limited public forum" is private property opened by the state as a " 'place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.' " *Anderson v. Mexico Academy and Central School,* 186 F.Supp.2d 193, 203 (N.D.N.Y.2002), *quoting Bronx Household of Faith v. Community School Dist. No. 10,* 127 F.3d 207 (2nd Cir.1997). Unlike the designated public forum, in a limited public forum "the State is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Central School,* 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Only speech within the genre or subjects that the government has admitted to the limited public forum are afforded constitutional protec-

tion. *See, e.g., Travis v. Owego–Apalachin School District,* 927 F.2d 688, 692 (2d Cir. 1991).

Indeed, "[t]he State may be justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" *Good News Club,* 533 U.S. at 106, 121 S.Ct. 2093 (*quoting Rosenberger v. Rector and Visitors of Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). Although the government is free to impose a blanket restriction on certain genres of speech, in a limited public forum, "once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Travis,* 927 F.2d at 692. The State's restriction on speech in a limited public forum, "must not discriminate against speech on the basis of viewpoint, and the restriction must be 'reasonable in light of the purpose served by the forum.'" *Good News Club, supra* (*quoting Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439 (internal citation omitted)). In addition, so long as a designated public forum remains open, it is bound by the same standards as applied to a traditional public forum. *Perry,* 460 U.S. at 46, 103 S.Ct. 948.

The final *Perry* category consists of public property that "is not by tradition or designation a forum for public communication." *Id.* Limitations on expressive activities in a non-public forum "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Int'l Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

The areas in dispute here are utility poles located on public sidewalks, along public streets, on medians that run along the center of streets and other general public areas. Ownership of the poles is divided between Oklahoma City and OG & E. The Court finds that the utility poles owned by Oklahoma City are a designated public forum, while the privately-owned utility poles are a subcategory of a limited public forum. The Court notes that a different standard of review is applicable as to the utility poles owned by OG & E; however, as OG & E has granted permission to Oklahoma City to place its brackets upon its poles, and neither OG & E nor the parties dispute the forum status of such poles separately, *all* of the utility poles at issue will be treated as owned by Oklahoma City for the purposes of this discussion. Accordingly, this Court will apply the same standards as applied to a traditional public forum, that is, whether the content restriction is necessary to achieve a compelling state interest and must be narrowly drawn to achieve that end. *Perry,* 460 U.S. at 46, 103 S.Ct. 948. Although Oklahoma City has the power to regulate the placement of banners, is it has allowed unrestricted placement of displays for over thirteen years. Some of the banners displayed have addressed certain health and social issues pertaining to the city. If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny. *United States v. Kokinda,* 497 U.S. 720, 726–27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

**C. REMOVAL OF THE CAF BANNERS IN 2001**

The government bears a particularly heavy burden in justifying viewpoint-based restrictions in a designated public forum. Viewpoint based discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 827, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Content-based restrictions are subject to strict scrutiny. *See Kokinda,*

497 U.S. at 726–27, 110 S.Ct. 3115; *Perry,* 460 U.S. at 46, 103 S.Ct. 948. Viewpoint-based restrictions receive even more critical judicial treatment. The Supreme Court noted in *Rosenberger:*

> The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics ... Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

*Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510. The Court did not explain what the government must show to overcome this heavy presumption. Here Defendant Couch alleges that his primary motive for the removal of the banners in 2001 was that he thought CAF's permission ended once the parade ended. If true, then Couch's motive is benign and CAF has suffered no violation of its First Amendment rights. CAF asserts, however, that Couch's removal of the banners was due to criticism of what the banners stated and represented. If this is proven to be true, then Couch's removal constitutes a violation of CAF's First Amendment rights. Accordingly, the Court finds that a material issue of fact remains as to whether the removal of CAF's banners in 2001 violated its constitutional rights.

**D. STRICT SCRUTINY ANALYSIS OF THE 2002 ORDINANCE**

■ As stated, the government bears a particularly heavy burden in justifying viewpoint-based restrictions in a designated public forum. *Cf. Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1279 (10th Cir.1996) (involving religious expression). Oklahoma City's sole justification for the restriction is that it wants to avoid the appearance of taking sides in political and social advocacy arguments. (Defendants' Motion at 23.) While avoiding the appearance of governmental bias on certain issues is a compelling government interest that may justify restrictions on speech in a designated public forum, *Rosenberger,* 515 U.S. at 836, 115 S.Ct. 2510, Oklahoma City's restriction is not necessary to serve this interest. As long as Oklahoma City provides equal access, there is no bias. *Cf. Rosenberger,* 515 U.S. at 836–845, 115 S.Ct. 2510 (holding that providing equal access to a designated public forum for citizens engaging in religious expression and citizens engaging in secular expression does not violate the Establishment Clause).

Furthermore, the ordinance is not narrowly tailored. A statute is narrowly tailored if it targets and eliminates no more than the exact source of the "evil" it seeks to remedy. *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 808–10, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The new ordinance prohibits those banners which promote any "political, religious or social advocacy organization or any political, religious or social advocacy message." *See* OKLAHOMA CITY MUNICIPAL CODE, Ch. 3, art. V, § 3–180 (2001). "Social advocacy message" is defined as "any communication in writing, in speech, or by signals which promotes, advocates or supports common behavior and/or beliefs among the general citizenry or any subgroup thereof." *See* OKLAHOMA CITY MUNICIPAL CODE at § 3–181. The Court finds the above-quoted terminology gives no standards to the permit-granting official. The Supreme Court has struck down licensing schemes that

give no standards for the licensing official to apply. *See, e.g., Hynes v. Mayor and Council of Oradell,* 425 U.S. 610, 622, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Saia v. People of New York,* 334 U.S. 558, 560–62, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). Conversely, where clear standards are established for the issuance of a license, the scheme satisfies the constitutional requirements. *See Heffron v. Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

A law is unconstitutionally vague when it fails to give reasonable notice of the conduct which is prohibited and gives law enforcement personnel the opportunity to enforce it according to their personal prejudices. *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Collin v. Smith,* 447 F.Supp. 676, 691 (N.D. Ill.), *aff'd* 578 F.2d 1197 (7th Cir.1978). In First Amendment cases, the doctrine has an added dimension, since a vague statute which covers speech-related activities may be enforced only against those who express unpopular opinions and may thus be used as a device for censorship. *Grayned v. City of Rockford,* 408 U.S. 104, 108–114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Statutes which punish speech solely on the basis of the emotion it arouses in other persons are vulnerable to findings of vagueness, *Ashton v. Kentucky,* 384 U.S. 195, 199–201, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), particularly where the emotion involved is subjective and difficult to determine with precision. *See, e.g., Smith, supra* (invalidating a law punishing "contemptuous" treatment or display of the American flag, on the grounds that in an era in which the flag is often treated casually, the precise conduct which could be considered "contemptuous" and result in criminal sanctions was impossible to de-

fine); *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (striking down an ordinance which prohibited groups of people from conducting themselves in an "annoying" manner on a public street. The Court held that the First Amendment right of free assembly could not be conditioned upon compliance with a purely subjective standard as "annoyance.").

Permissible standards can be found in "the words of the ordinance itself," "the interpretations the court below has given to analogous statutes," and "perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. Here, the language of the ordinance gives no standards to those enforcing it; the ordinance allows a subjective determination by the official as to what banner qualifies as a "political, religious or social advocacy message." *Cf. Grayned,* 408 U.S. at 108–09, 92 S.Ct. 2294 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and *subjective* basis, with the attendant dangers of *arbitrary and discriminatory application.*" (emphasis added)). Furthermore, since the ordinance is newly-adopted, there has been no opportunity for lower court interpretation.

■ The sworn deposition given by Defendant Couch illustrates the dilemma one interpreting the ordinance faces. Defendant Couch testified that an application for a campaign to stop syphilis was educational or medical, as were banners from the Department of Human Services for "Quality Child Care," "Celebrate Children," and "Early Years–Learning Years." An application from the Association of Central Oklahoma Governments for banners that stated "Clean Cities, The Route to Clean Fuels" was approved on the theo-

ry that it did not promote common behavior, thus constituting a social advocacy message, although Couch admitted that the banner promoted the use of natural gas, electric fuels, and electric powered vehicles. Furthermore, Couch testified, an educational banner about free speech rights would not be a "social advocacy program."

This Court finds that the informal interpretation of § 3–181(4) does not establish the clear criteria required by the First Amendment. At best, Defendant Couch's testimony explained only a few reasons that he has used to recommend granting or denying an application, and there is no suggestion that those reasons would provide the exclusive standards in deciding whether to issue a permit. In essence, the decision makers rely on their own intuitive judgment; however well exercised, it is an insufficient standard to be applied in determining the permissibility of First Amendment activities. In the absence of clear standards, Oklahoma City retains "'the power to enforce the ordinance in a manner that favors some viewpoints over others.'" *ACORN v. City of Tulsa*, 835 F.2d 735, 741 (10th Cir.1987), *quoting ACORN v. Golden*, 744 F.2d 739, 748 (10th Cir.1984). The ordinance sufficiently fails in its reach to delineate words of common understanding, *Grayned*, 408 U.S. at 112, 92 S.Ct. 2294, so that "ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Thus, the banner ordinance is not narrowly tailored to serve a compelling interest.

In sum, absent a convincing and constitutional reason for the denial, the evidence leaves this Court with but one conclusion: That Oklahoma City denied CAF's 2002 application based on CAF's beliefs and advocacy. For the last fifty years, the Supreme Court has made it clear that such a denial is unconstitutional:

Even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (*quoting Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (alteration in *Perry* )).

## IV. CONCLUSION

The Motion for Summary Judgment of Defendant Couch in his individual capacity is GRANTED and Plaintiff CAF's complaint as to Defendant Couch in his individual capacity is dismissed. Defendants' Motion for Summary Judgment is DENIED and Plaintiff's Motion for Summary Judgment is GRANTED IN PART. CAF is entitled to a declaratory judgment, as the ordinance on its face and as applied to CAF is an unconstitutional violation of CAF's right to freedom of speech under the First Amendment. CAF is entitled to at least nominal damages as a result. Furthermore, CAF is entitled to injunctive relief, prohibiting Defendants from imposing, exercising, or otherwise utilizing the new ordinance. CAF is not entitled to a declaratory judgment stating that Defendant Couch's removal of its banners in 2001 was discriminatory, as a genuine is-

sue of material fact exists as to Couch's motive. The entry of judgment; liability, and, if appropriate, damages for the 2001 removal; damages for the 2002 denial of CAF's application; and any award of costs and attorney's fees is hereby reserved until the conclusion of trial.