Keith L. MASON, and Cradles of Love, Inc., d/b/a Survivors of the Abortion Holocaust, Plaintiffs,

v.

Dean WOLF, individually, and in his official capacity as Executive Vice President for Administration for the Auraria Higher Education Center, Dick Feuerborn, individually, and in his official capacity as Director of the Division of Facilities Planning and Use for the Auraria Higher Education Center, and Barbara Wieske, in her official capacity as Director of the Events Center of the Auraria Higher Education Center, Defendants.

No. CIV.A. 03–F–381 (PAC).

United States District Court, D. Colorado.

Feb. 15, 2005.

James Parker Rouse, Sr., Rouse & Associates, PC, Greenwood Village, CO, for Plaintiffs.

Joseph Quintus Lynch, Attorney General's Office, Denver, CO, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FIGA, District Judge.

This matter was tried to the Court on February 7 through February 9, 2005. The Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

### BACKGROUND

This case arises out of events that occurred in April 2002, when Plaintiffs Mason and Cradles of Love, Inc., d/b/a/ Survivors of the Abortion Holocaust ("Survivors") sought to demonstrate on the Auraria campus of the Auraria Higher Education Center ("AHEC") to promote their pro-life, anti-abortion message. Plaintiffs [1] filed this action in

---

1. On November 25, 2003, the Court granted Plaintiff McCullough's motion for voluntary dismissal pursuant to Rule 41(a)(2), F.R.Civ. P., so the only remaining plaintiffs are Mason and Survivors.

March 2003, asserting five claims against Defendants Wolf and Feuerborn alleging defendants violated each, plaintiffs' constitutional rights in connection with the demonstration, in contravention of 42 U.S.C. § 1983, by depriving them of their First Amendment rights of freedom of expression (Claims One and Two) and by enforcing against them written and unwritten regulations regarding means of expression they claimed were allegedly vague and overbroad (Claims Three, Four and Five). Plaintiff Mason, alone, asserted claims against Defendants Coogan, the Chief of the Auraria campus police, and Officer Stahl, an officer of the Auraria campus police, under 42 U.S.C. § 1983, for violating his Fourth Amendment right to be free from unreasonable arrest.

Plaintiff Mason's claims against Defendants Coogan and Stahl were dismissed by Order of this Court on January 9, 2004. To the extent Defendants Wolf and Feuerborn were being sued in their official capacities, such claims against them were dismissed by the Court's order of January 9, 2004, pursuant to the doctrine of sovereign immunity. Prior to trial, plaintiff voluntarily dismissed Claims Three, Four and Five as the regulations that were the subject of those claims had been revoked or revised. New regulations not directly at issue here now govern access to AHEC for expressive activities.

Accordingly, the only claims tried to the Court were the First and Second Claims of Plaintiff Mason and Survivors against Defendants Wolf and Feuerborn, alleging defendants violated plaintiffs' constitutional rights in contravention of 42 U.S.C. § 1983 by depriving them of their First Amendment rights of freedom of expression, and requesting damages and declaratory and injunctive relief. Defendant Wieske, added as a defendant on the First and Second claims in November 2004, is being sued solely in her official capacity as the representative of AHEC who may be subject to prospective declaratory or injunctive relief.

Defendants Wolf and Feuerborn contend that they did not violate plaintiffs' First Amendment rights, and to the extent they are being sued for damages assert they are protected by qualified immunity insofar as they are being sued in their individual capacities.

## PLAINTIFFS' CLAIMS

The Court finds as follows.

Plaintiff Survivors describes itself as a "Christian, pro-life activism organization" that, among other things, "promotes the pro-life message in schools and universities." (Complaint, ¶ 6.) Plaintiff Mason, a resident of Denver, described himself as a member of Survivors in the complaint (*Id.*, ¶ 4.). But at trial, Survivors asserted that it has no members and Mason testified that the reference in the complaint was factually erroneous. It appears that Plaintiff Mason was a "volunteer" on the dates in question.

The Auraria campus consists of three separate educational institutions: Community College of Denver, Metropolitan State College and University of Colorado at Denver. Its facilities are administered by Defendant AHEC. According to a state statute, AHEC was formed to facilitate the execution and performance of the constitutional and statutory responsibility of the governing boards of the constituent institutions. C.R.S. § 23–70–101(1)(c).

In April 2002, Defendants Wolf and Feuerborn were employees of AHEC. Defendant Wolf was, and continues to be, the Executive Vice President of Administration. His subordinate, Defendant Feuerborn was the division director of Facilities Planning, but has since retired from that position. Feuerborn was responsible for establishing and enforcing policies and

procedures related to the planning and use of facilities at Auraria, including scheduling and assignment of location and making of arrangements for special events on the campus.

On or about April 1, 2002, Survivors, through former Plaintiff McCullough, contacted Feuerborn and requested to make arrangements for Survivors to distribute literature and display signs promoting its message at the Auraria campus. According to his testimony, McCullough, who was unfamiliar with the campus layout, requested a location that would "maximize" the group's exposure or be in a "high traffic area." According to Defendant Feuerborn's notes of his conversation with McCullough (Trial Exhibit 13), Survivors participants were "[n]ot familiar with campus [and] would like something central" for its proposed activities.

In an e-mail to McCullough sent on April 2, 2002, Feuerborn confirmed the arrangements made for Survivors to visit the campus on April 12, 2002, and specified that the "group will be restricted to a specific area that is on the major pedestrian spine of the campus." (Trial Exhibit 1.) Attached to the e-mail was a map of the campus. Although a copy of that e-mailed map was apparently not introduced into evidence (Trial Exhibit 2 being denied by Feuerborn as the map he attached to the e-mail), Feuerborn was certain he had identified the location referenced in the e-mail on the map that was attached. In any event, Feuerborn did not hear back from McCullough prior to the date of the demonstration regarding any issues about the assigned location.

When the Survivors group arrived at Auraria on April 12, 2002, they were directed by Defendant Feuerborn to the steps of the Plaza Building on the north side of the Lawrence Street Mall, a pedestrian walkway that bisects the campus. According to Feuerborn, he selected this location pursuant to an unwritten policy then applied to demonstrations by nonstudent groups who did not have a student group as a sponsor (unsponsored nonstudent groups). According to this policy, students or student groups were permitted to demonstrate or gather in an area known as the "flagpole" area, while unsponsored nonstudent groups were assigned to the steps, or amphitheater, in front of the Plaza building. The flagpole area describes an area approximately 30 feet east of where the Lawrence Street Mall intersects the Tenth Street Mall, a pedestrian walkway which also bisects the campus. At the flagpole area there is a wide concrete space, sufficiently large to accommodate tables for persons handing out information, or engaged in other activities, without impeding the flow of pedestrian traffic.

After a period of about one to one and one-half hours, Mason and McCullough felt that there was not enough pedestrian traffic moving along the Lawrence Street Mall past the location where they were demonstrating. April 12, 2002 fell on a Friday, when classes and student traffic are somewhat less than most other weekdays during the academic year. Mason and McCullough were also displeased that Defendant Feuerborn's instructions not to encroach onto the Lawrence Street Mall beyond a certain described "line" prevented them from coming closer than within ten to fifteen feet of passersby, which they felt interfered with their effort to get out their message and hand out leaflets. McCullough and Plaintiff Mason testified that they observed many more people traversing the Tenth Street Mall through the flagpole area.

After noticing the traffic through the flagpole area, Plaintiff Mason, McCullough and the other volunteers with the Survivors group left the steps of the Plaza Building and proceeded towards the flagpole

area. Before they reached the flagpole area they were stopped by campus police officers, including former Defendants Coogan and Stahl.

Conveniently for the Court, there is a videotape of the events which then ensued. McCullough and Plaintiff Mason told the officers that because there was not enough traffic past the Plaza Building, they wanted to go over to the flagpole area to hold their signs and pass out their literature. Defendant Coogan and Officer Stahl responded that there was quite a bit of traffic passing by on the Lawrence Street Mall, and that the group was "doing a good job" getting out its message. McCullough and Plaintiff Mason were not satisfied with that answer and continued to press to go over to the flagpole area. Chief Coogan was adamant that the group could not go over to the "flagpole area" because they had been assigned to the Plaza Building area and had to remain there. She also may have stated that AHEC did not allow anyone to demonstrate at the flagpole area. Defendant Feuerborn echoed Chief Coogan and indicated that AHEC had designated the stairs of the Plaza Building to be the freedom of speech area for the group.

Plaintiff Mason persisted that he wanted to move the group to the "flagpole area," and stated several times that he was going to the area to exercise his First Amendment rights. He was advised by Chief Coogan that he could be arrested if he did so. Mason asked for clarification of what the charges would be. He was told that would be determined later.

Mason indicated that he would go to the flagpole area, and although he does not appear on the videotape to have taken any further steps towards the flagpole area, Officer Stahl then arrested him and placed him in handcuffs. Mr. Mason was driven away in a police vehicle. The other members of Survivors returned to the Plaza Building.

It was also shown on the videotape that during this time an individual was handing out leaflets in the flagpole area. It was later ascertained that he was promoting a fundraiser for a Tibetan freedom night (*see* Trial Exhibit 10). Campus police officers were standing a distance away but did not do anything to arrest the individual. A volunteer with Survivors went up to the individual and asked him if he had been threatened with arrest, and the individual responded that he had not. The videotape also showed that Defendant Feuerborn approached the individual. Defendant Feuerborn testified at trial that he was seeking to ascertain, and did eventually confirm, that the individual who was leafleting at the flagpole area was a student and was connected with a student organization.

Plaintiff Mason was taken to the Auraria Campus police holding cell, from which he was eventually transferred to the Denver City Police lockup. He was released on bond some hours later. He was charged with unlawful conduct on public property in violation of C.R.S. § 18–9–117(b). The case against Mr. Mason was ultimately dismissed at the request of the Denver District Attorney's Office. *See* Trial Exhibit 24.

Mr. Mason testified that he was "humiliated" by having been arrested. He testified that he was kept in the Auraria police holding cell on a hard bench, to which he was also handcuffed. He testified that at the Denver City Police lockup, he was kept in a cell or area with several other arrestees whom he described as unsavory characters. He claims he is entitled to damages for his deprivation of constitutional rights and his resultant arrest. He testified that prior to the occurrence of these events he had a "sponsor" who provided

him with a monthly subsidy of $100, and that after the event that sponsor discontinued the subsidy.

The evidence also showed that Survivors posted news of the event of the Auraria demonstration, including Mr. Mason's arrest, on its website. Since his arrest, Mr. Mason has become an employee of Survivors and is now the director of the campus tour. Since April 2002 Mr. Mason has been arrested at least two additional times in connection with activities at Survivors' demonstrations. His arrests have not caused him to lose his position with Survivors nor incur discipline from his employer.

**PLAINTIFFS' FIRST AND SECOND CLAIMS**

As noted above, both Defendants Feuerborn and Wolf assert a defense of qualified immunity. To establish a constitutional violation that will survive a claim of qualified immunity, the evidence must show both a clearly established constitutional right and demonstrate conduct that violates that right. *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir.1995). "To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir.1995), quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Although the very action in question does not have to have previously been held unlawful, 'in the light of pre-existing law the unlawfulness must be apparent.' " *Id.* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority

from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992).

Plaintiffs allege in the First and Second claims for relief that Defendants Wolf and Feuerborn by the various actions described above, which were admittedly taken under color of state law, violated their rights to free speech under the First Amendment to the United States Constitution. Whether the plaintiffs' First Amendment rights were violated is the first question this Court must address.

The structure for evaluating plaintiffs' claims is provided in *Summmum v. Callaghan*, 130 F.3d 906, 913 (10th Cir.1997), in which the Tenth Circuit stated: "In *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Supreme Court set out a three-step framework for analyzing the constitutional protections afforded to private speech on government property." Applying those three steps here require this Court to determine: a) whether the plaintiffs' contemplated expressive activities, including their leafleting and placard display are protected speech; b) whether the flagpole area is a public forum, or a non-public forum, and if public, whether it is a traditional public forum, or a designated public forum, because the extent to which the defendants may regulate access to this area depends on the categorization;[2] and c) whether the defendants' justifications for excluding plaintiffs from the flagpole area satisfy the requisite standard. *See Summum, supra*, at 913.

---

**2.** The definitions of traditional public property and designated public property, both of which are "public forums," and property which is a nonpublic forum, as well as the limits on the government's ability to restrict

expressive activity on each, are set forth in the Supreme Court's opinion in *Perry Educ. Ass'n. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

### 1. Plaintiffs' Protected Speech

Here, as was the case in *Summum*, the first step "is easily disposed of." *Id.* Plaintiffs describe their function as informing and educating the general public regarding the significant evils of abortion and the sanctity of human life from the moment of conception through natural death. Survivors promotes the pro-life message in schools and universities through its "campus tour" and the distribution of literature and informational displays. Plaintiff's representative, McCullough, contacted Defendant Feuerborn to make arrangements to present Survivor's pro-life message at Auraria during the campus tour of 2002. Defendant Feuerborn was aware the group was a pro-life group. Here, the speech in question is either private religious speech or secular private expression, which are equally protected under the First Amendment. *Id.* at 913–14. This Court sees no argument that the plaintiffs' message here is not protected speech. Accordingly, the first step in the analysis is satisfied.

### 2. Public or Nonpublic Forum

Rather, the major point of contention arises under the second step of the three-part analysis, namely whether the flagpole area is a public area, either a traditional public forum or a designated public forum, where "the rights of the state to limit expressive activity are sharply circumscribed," *Perry, supra,* at 45, 103 S.Ct. 948, or whether it is a nonpublic forum where the defendants right to regulate is subject only to restrictions that are "reasonable." *Id.* at 46, 103 S.Ct. 948.

Plaintiffs argue that the flagpole area is a public forum-either traditional public forum or a designated public forum, in which case, for the defendants to enforce content-based restrictions they must show that the restriction serves a compelling state interest, and that it is narrowly drawn to achieve that end. *Id.* at 46, 103 S.Ct. 948.

Plaintiffs argue that the defendants policy was "content-based" as their group was apparently the only group assigned to the Plaza Building steps under the policy. This fact, however, is not dispositive here, as it appears that Survivors was the first, and perhaps only, group to seek to demonstrate at Auraria without a student sponsor.

Rather, the issue here is whether the policy was used to exclude plaintiffs from the flagpole area because of the content of their message. The Court finds that defendants did not impose "content-based restrictions" here. There is no evidence the policy that limited access to the flagpole area was "content based." Indeed, Trial Exhibit 18, which counsel laboriously reviewed page by page at trial, clearly reflects otherwise. That exhibit contains records of the permits issued for the flagpole area during the Fall of 2001 and the Spring of 2002, and it is apparent that a wide range of organizations and viewpoints was permitted at the flagpole area. The only factor that has been shown to be determinative of where groups were permitted to demonstrate is whether or not they are student groups, or student-sponsored groups, which are permitted to use the flagpole area, or if they are so-called "off campus" groups, not sponsored by a campus organization, which are assigned to the Plaza Building area.

Where defendants, seeking to regulate a traditional public forum, are applying regulations that are content neutral, the defendants may enforce regulation of the time, place and manner of expression, provided the regulations are "content-neutral" and are "narrowly tailored to serve a *significant* government interest, and leave open ample alternative channels of communication." *Perry, supra,* 460 U.S. at 45,

103 S.Ct. 948 (emphasis in original). *See also Wells v. City and County of Denver,* 257 F.3d 1132, 1145 (10th Cir.2001), *cert. denied,* 534 U.S. 997, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001); *Hawkins v. City and County of Denver,* 170 F.3d 1281, 1286 (10th Cir.1999), *cert. denied,* 528 U.S. 871, 120 S.Ct. 172, 145 L.Ed.2d 145 (1999).

■ However, if the flagpole area is a nonpublic forum, as defendants appear to contend, in addition to time place and manner regulations, the defendants may reserve the forum for its intended purposes as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. *Perry, supra,* at 46, 103 S.Ct. 948.

■ Traditional public forums, according to the Supreme Court, are places "which by long tradition or by government fiat have been devoted to assembly and debate." *Perry, supra,* 460 U.S. at 45, 103 S.Ct. 948. As examples of such places the Supreme Court in *Perry* listed "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.,* quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

■ The plaintiffs here allege and argue, as noted above, that the flagpole area is a "traditional public forum." (Com-

plaint, ¶¶ 46, 58). They point out that the flagpole area, located at the intersection of the Lawrence Street Mall and the Tenth Street Mall, a concrete paved open space, is surrounded by grass and benches, and is primarily a wider space along a pedestrian sidewalk which runs between the Plaza and Arts buildings and between the PE/Events Center and the Library/Media Center. They further urge that the flagpole area is for the use of students and non-students alike.[3] (*Id.* at ¶ 20). The plaintiffs argue that the flagpole area has been "routinely used for the First Amendment activities of various student and non-student groups." (*Id.* at ¶ 24). Plaintiffs also argue that they sought to leaflet at the flagpole area, and were restricted from doing so by defendants, yet at the same time another individual was handing out leaflets in the flagpole area advertising a fundraiser for Tibetan freedom. They suggest that this evidence indicates the traditional public forum nature of the flagpole area.

Notwithstanding its statements in *Perry,* the Supreme Court later expressed a hesitancy to expand the list of traditional public fora to include airports.[4] Although this Court stated in its Order of January 9, 2004, that it interprets the Supreme Court's statement in *Perry* that "places which by long tradition ... have been devoted to assembly" to be a description of the types of places generally that are public fora, and not necessarily descriptive of

---

**3.** This argument implicitly attempts to distinguish the flagpole area from the "Galleria" area of the Denver Center for the Performing Arts, at issue in the case of *Hawkins v. City and County of Denver,* 170 F.3d 1281 (10th Cir.1999). In *Hawkins,* the Tenth Circuit found the Galleria was not a public forum, as it is not "analogous to a public right of way or thoroughfare." 170 F.3d at 1287. Rather, the court described the Galleria as not forming "part of Denver's automotive, bicycle or pedestrian transportation grid, for it is closed

to vehicles, and pedestrians do not generally use it as a throughway to another destination." *Id.*

**4.** In *International Society for Krishna Consciousness v. Lee,* 505 U.S. 672, 680, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) the Court stated that airports are of too recent vintage to be "immemorially ... time out of mind" held in the public trust and used for purposes of expressive activity.

the history of the particular place that is at issue in any given case, here the evidence now received shows that the flagpole area is not a "traditional public forum."

As the plaintiffs recognize, prior to 1988, the Lawrence Street Mall and the Tenth Street Mall did not exist, as the streets then ran through campus. Certainly, the flagpole area did not exist prior to 1988. At that time, when the streets ran through the campus, even if there were sidewalks along them, there is no showing that this area was used as a public forum.

Since 1988, when the malls were constructed, they have served as pedestrian ways through the campus. However, there is no evidence that prior to 1988 the intersection of the two malls, the flagpole area, had been used traditionally for purposes of assembly, or for communicating thoughts between citizens and discussion of public questions. Rather, the evidence shows that only within the last two decades has the flagpole area been used for expressive purposes, and then principally by student groups. All groups must obtain permits to set up displays or have demonstrations. There is no evidence that unsponsored non-student groups have "traditionally" been permitted to use the flagpole area, if at all.

On the other hand, the flagpole area is not a nonpublic area, as defendants appear to contend. It is an unrestricted walkway that is used, or can be used, by the public as well as the students. The AHEC is a state-owned and state-regulated facility, not a private entity. Unlike the Galleria described in *Hawkins, supra*, the malls and the flagpole area are part of a pedestrian grid that bisects the campus. They are not there simply "to permit ingress and egress to the various buildings." The malls transverse the length of the campus, both east to west, as well as north to south.

■■■■■ Rather, it seems quite apparent that the flagpole area fits the description of a designated public forum. As described by the Tenth Circuit in *Summum, supra:*

A designated public forum is property the government has opened for expressive activity, treating the property as if it were a traditional public forum. A designated public forum may be created for a "limited purpose" for use "by certain speakers, or for the discussion of certain subjects." (citation omitted) For example, "[u]niversity facilities opened for meetings of registered student organizations qualify as a designated public forum." *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir.1996) (citing *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)), *cert. denied*, 519 U.S. 949, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996).

Unlike a traditional public forum, the government "is not required to indefinitely retain the open character" of a designated public forum. (citation omitted). However, as long as the property is designated as a public forum, the government is "bound by the same standards as apply in a traditional public forum." *Id.* Thus, content-based regulations must be narrowly drawn to effectuate a compelling state interest and reasonable time, place, and manner regulations are permissible. *Id.*

130 F.3d at 914.

■■■■ This Court is further reinforced in its finding that the flagpole area is a designated public area, by the following statement found in *Summum:*

Sometimes included within this category of designated public forum is property referred to as a "limited public forum." In *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), for example, the Supreme Court held that a

state university had created a "limited public forum," *id.* at 272, 102 S.Ct. 269 ... by making its facilities generally available for the activities of registered student groups, and applied the strict scrutiny test to the university's decision to exclude a religious student group from using its facilities, *id.* at 269–70, 102 S.Ct. 269 .... Thus, in *Widmar,* the term "limited public forum" was used specifically to denote a particular sub-category of the designated public forum- a designated public forum for a limited purpose for use by certain speakers, i.e., registered student groups.

130 F.3d at 914.

The Tenth Circuit has further explained the test to be applied when a government entity seeks to regulate speech in a designated public forum. In *Wells v. City and County of Denver,* 257 F.3d 1132, 1145 (10th Cir.2001), the Court held:

Designated public fora differ from traditional public fora in that "a State is not required to indefinitely retain the open character of the facility ...." While a designated public forum remains open for public discourse, however, the government is subject to the same standards that apply in a traditional public forum.

257 F.3d at 1145 (citations omitted).

As noted above, where the regulations are content neutral, the test applied to a traditional public forum is whether the regulations are "narrowly tailored to serve a *significant* government interest, and leave open ample alternative channels of communication." Accordingly, since the flagpole area is a designated public forum, and since the defendants' regulations have been found to be content neutral, this is the test that must be applied to the defendants' regulation.

3. *Analysis of AHEC's Regulation*

As stated above, the regulation employed by defendants to prevent plaintiffs from demonstrating at the flagpole area is one which differentiates between student groups or student sponsored groups, on the one hand, and off-campus groups, on the other hand. As Defendant Feuerborn testified, he was involved in formulating the policy in Fall of 2001, with an intent to create a "free expression" zone for off-campus groups in front of the Plaza Building. He testified that he felt this was a fair location and that there was ample pedestrian traffic along the Lawrence Street Mall to give such groups a fair audience. On the other hand, if the group was a student group, or was sponsored by a student group, the group could use the flagpole area.

■■■ First, in order for such a regulation to pass constitutional muster for a designated public forum, "it must leave open ample alternative channels of communication." The Court finds that assignment of non-student groups to the steps of the Plaza Building does provide an ample alternative channel of communication. The steps of the Plaza Building are approximately ten to fifteen feet from the Lawrence Street Mall pedestrian way. There are no barricades or impediments between the steps and the pedestrian way so as interfere with communications. Moreover, the Plaza Building is hardly an "obscure" location as described by Plaintiff Mason. It is approximately 100 feet from the intersection of the Lawrence Street Mall and the Tenth Street Mall. In fact, it is only approximately 130 feet from the flagpole area.

Numerous photographs of the two areas are contained in trial exhibits 4, 5, 6, 7, and 8. However, the Court, accompanied by counsel and the parties, visited the actual site on February 8, 2005. The Court finds that the photographs do not necessarily convey the proximity between the Plaza Building steps and the flagpole area.

Each area is within easy sight distance of the other. Approximately 60 to 70 paces are all that is required to walk from the Plaza Building to the flagpole area. Any person in the flagpole area could easily observe any demonstration occurring on the steps of the Plaza Building. Thus, this Court finds that the Plaza Building location does provide an "ample alternative channel of communication" to non-student or off-campus groups assigned there.

█ The second prong of the test is whether the restriction or regulation is "narrowly tailored to serve a *significant* government interest." The only testimony provided to explain the government interest at issue here came from Defendants Wolf and Feuerborn. Mr. Wolf testified that the reason student groups were permitted to use the flagpole area was because the students' fees, or the student groups' fees, paid the costs of clean up and maintenance of the flagpole area. However, in response to questions from the Court, Defendant Wolf also stated that the costs of cleanup and maintenance at the Plaza Building were also paid by student fees. Thus, this rationale hardly supplies a credible "government interest," much less a significant one, for differentiating between the two locations.

█ Defendant Feuerborn appears to testify that one reason for the regulation was a concern for disruption of traffic around the flagpole area, based on an event involving an off-campus group, again involving abortion as its focal point, that occurred in 2000. That event generated counterprotests and appeared to have the propensity to turn violent. Feuerborn seemed to be stating that his concern for avoiding disruptions, and his concern for situations that might escalate towards possible violence, prompted the formulation of the regulation restricting off-campus groups to the steps of the Plaza Building. However, again upon questioning by the

Court, Mr. Feuerborn stated that he had no reason to believe that an off-campus group was any more likely to pose a risk or cause a volatile situation than a student group. This reason, therefore, does not supply the significant government interest required to support such a regulation discriminating between groups.

█ It appears that another reason Mr. Feuerborn articulated was the need to have the flagpole area available for students, and that because students are the main constituency of the campus, it was his "first obligation" to have the area available for them. However, Mr. Feuerborn could not explain why an absolute ban on demonstrations by unsponsored off-campus organizations at the flagpole area was necessary, when coordinated scheduling of events could achieve the same result. Moreover, while making the flagpole area available to students is a justifiable priority of the campus, excluding nonstudents not sponsored by campus organizations without regard to the existence of an actual schedule conflict does not meet the test of a regulation "narrowly tailored to meet the government interest." After all, nonstudents who obtain campus sponsorship have the same rights under the regulation as students to express themselves as a group at the flagpole area.

It may well be that there are significant governmental reasons to differentiate between student groups and nonstudent groups sponsored by a campus organization, on the one hand, in contrast to unsponsored nonstudent groups on the other hand, when regulating speech activities on a college campus. But no such significant reasons have been articulated by the defendants here to justify a regulation differentiating between student and non-student groups being assigned to different locations on the campus only 130 feet apart. Thus this Court finds that the unwritten

regulation limiting unsponsored nonstudent groups to the Plaza Building steps, and prohibiting them from the flagpole area without a student sponsor, lacks a sufficient justification to pass the applicable constitutional test and that the enforcement of such a regulation violated the First Amendment rights of plaintiffs.

## DECLARATORY RELIEF

Plaintiffs are thus entitled to a declaration that the regulation enforced against them was unconstitutional. Enforcement of such a regulation, or any regulation that differentiates between use of the flagpole area and use of the Plaza Building steps, based on whether or not the speaker is a student or unsponsored nonstudent group, would violate the First Amendment rights of plaintiffs given the record in this proceeding.

## QUALIFIED IMMUNITY DEFENSE

■ Whether defendants are entitled to qualified immunity from plaintiffs' request for damages is a different question. First, with respect to Defendant Wolf, there is no evidence that he was involved in any way with the determination to assign plaintiffs to the Plaza Building. Although he acknowledged a familiarity with the regulation, it is not clear that he was involved with the decision to apply it to plaintiffs.

■ As the Tenth Circuit stated in *McCook v. Springer School District*, 44 Fed.Appx. 896 (10th Cir.2002), a case involving alleged violations of First Amendment rights, "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation," citing to *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.1997) (citation omitted). As the Tenth Circuit also stated in *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir.1996), "[s]upervisor status alone is insufficient to support liability, [citation omitted] . . . a supervisor is not liable under § 1983 for the actions of a subordinate

unless an "affirmative link" exists between the constitutional deprivation and either the supervisor's personal participation or his failure to supervise, [citation omitted] . . . ."

Here, there is no evidence of personal involvement by Defendant Wolf, much less a "conspiracy" involving him as plaintiffs' counsel suggested. There is no indication that he was present on April 12, 2002, when plaintiffs were prevented from relocating to the flagpole area. Thus, the Court finds that there is no basis to support a judgment for damages under 42 U.S.C. § 1983 against Defendant Wolf based on violations of plaintiffs' First Amendment rights.

■ Defendant Feuerborn, on the other hand, testified not only that he applied the unwritten regulation to plaintiffs, but also that he was involved in devising the regulation in the Fall of 2000 or 2001. Thus he, unlike Defendant Wolf, was personally and centrally involved in the events described above. At the time the regulation was devised, the First Amendment law was clearly established. The cases required a narrowly tailored regulation enforcing a significant government interest if a governmental entity was to restrict free speech in a designated public area. The *Summum* case decided in 1997 said as much, not to mention the 1983 *Perry* case decided by the United States Supreme Court. At the time the regulation was applied to plaintiffs in April 2002, the law was the same.

■ Once a constitutional right has been found to be clearly established, the next question is whether a reasonably objective official would be aware of that right. Or, as the Tenth Circuit stated in *Roska v. Peterson*, 328 F.3d 1230 (10th Cir.2003):

Concerning the "clearly established law" requirement, the contours of the right must be sufficiently clear such that an objectively reasonable officer would understand that what she is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "If the law was clearly established, the immunity defense *ordinarily* should fail, since a reasonably competent public official should know the law governing his conduct." [Citation omitted; emphasis in original.]

"Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." [Citation omitted.] In other words, a civil rights defendant is "entitled to *'fair warning'* that his conduct deprived his victim of a constitutional right." [citation omitted; emphasis in original.]

328 F.3d at 1247.

■ The question then is whether Defendant Feuerborn was on "fair notice" that his actions on April 12, 2002 deprived plaintiffs of their constitutional rights, or whether there may be "extraordinary circumstances" here that would suggest he did not have such fair warning.

The Court views this as a close question on the facts of this case. Defendant Feuerborn did not actually enforce the regulation against plaintiffs until approximately 11:50 am on the morning of April 12, 2002. When plaintiffs first applied for permission to have their demonstration, they did not request to hold it at the flagpole area. Plaintiff Mason testified he had no conversations with Defendant Feuerborn regarding the location of the demonstration before arriving at campus. Despite admitting a familiarity with the campus from prior visits, Plaintiff Mason did not request that the group be placed at the flagpole area, or any specific area.

McCullough also testified that he did not request a specific location for the Survivors' planned demonstration, and that he had no familiarity with the Auraria campus. He stated he asked for a "high traffic area." When Defendant Feuerborn responded to McCullough's request for a "central" or "high traffic" area, he placed the group on the steps of the Plaza Building where he rightly felt there could be, or would be, high traffic. McCullough testified that he never requested placement at the flagpole area. Indeed, he acknowledged that he had no familiarity with the area. Thus, Feuerborn did not deny plaintiffs the right to demonstrate at the flagpole area at any time before they arrived on April 12, 2002. The parties have cited no cases stating that a government official has a constitutional duty to unilaterally assign a particular location to an applicant for a place to demonstrate.

Only when the plaintiffs expressed dissatisfaction with the assigned location, some 1 to 1½ hours after arriving, did the situation arise where Feuerborn denied plaintiffs the right to relocate to the flagpole area. He did so directly, and apparently by directing the police to prevent the relocation.

However, in so insisting that plaintiffs remain on the steps of the Plaza Building, Defendant Feuerborn may well have felt that he was adhering to an agreement and understanding that he had reached with McCullough, namely that the plaintiff group would demonstrate at the Plaza Building, and not elsewhere. It could be argued that Feuerborn was no more trying to prevent the group from demonstrating elsewhere, than he was trying to enforce his understanding of an agreement that they would remain at the building. Yet certainly from plaintiffs' perspective, they

made no "agreement"-they just went to demonstrate where they were told to go.

While it appears that the Defendant Feuerborn was not acting with malice or a lack of "good faith," the Court finds that a person in his position as a campus administrator was on fair notice in 2002, based on the Tenth Circuit decision in *Summmum,* as well as the national standard set well before in *Perry,* that his conduct in precluding plaintiffs from demonstrating at the flagpole area, at a minimum a designated public area, violated their clearly established constitutional rights.

Accordingly, the Court finds that qualified immunity does not protect Defendant Feuerborn's conduct in this case. He is therefore liable to plaintiffs on their respective claims.

## PLAINTIFFS' REQUEST FOR DAMAGES

■ The Court finds, nonetheless, that Plaintiff Survivors has not established by a preponderance of the evidence that it is entitled to any damages here under the Second Claim for Relief. Survivors has stated that it is not seeking any damages on behalf of its members. Indeed, it has been quite adamant that it has no members. Thus, the only damages that Survivors would be entitled to receive would be damages for its own injury.

■ The abstract violation of a constitutional right may not form the basis for Section 1983 damages. *Memphis Community School District v. Stachura,* 477 U.S. 299, 308, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Compensatory damages cannot be awarded "absent proof of actual injury." *Id.* Here, there has been no proof by a preponderance of the evidence that Survivors suffered any monetary injury. Moreover, an organization cannot recover for humiliation or other emotional distress. *See Irish Lesbian and Gay Organization v. Giuliani,* 143 F.3d 638, 650 (2d Cir. 1998). An organization could, however, recover for injury to its reputation resulting from a violation of its First Amendment rights. *Id.*

Survivors here contends that it suffered damage to its reputation. Its evidence consists of some vague information that its summer camp attendance was less after the incident at Auraria. There is, however, no evidence that shows a link between such alleged diminished attendance and the events at Auraria. There was no evidence that Survivors' activities were otherwise curtailed. Plaintiff Mason testified that in 2004 Survivors' campus tour visited some 212 college and high school campuses. As such, this Court is not persuaded that any compensable damages have been proven by Survivors. It is only entitled to nominal damages in the amount of one dollar.

■ Plaintiff Mason, as noted above, in part claims damages in the First Claim for Relief based on injury to his reputation and based on his humiliation and embarrassment over being arrested. The Court finds that Plaintiff Mason has not proved by a preponderance of the evidence that he suffered injury to his reputation as a result of the events of April 12, 2002. Since that day he has gone on to become the paid director of the campus tour of Survivors, he has led the campus tour to many venues, and he apparently sits as a *de facto* member of the Survivors' board of directors.

Plaintiff Mason's claims of mental distress, humiliation and embarrassment appear to arise not from the denial of his First Amendment rights, but from the arrest which followed. Defendant Feuerborn did not direct, or necessarily cause, plaintiff Mason's arrest. Mason was arrested, as this Court previously found, for disobeying a facially lawful order that he not demonstrate at the flagpole area. The order was enforced by the police officers

after Plaintiff Mason indicated that he was intending to go to the flagpole area. In addition, the Court finds that being arrested does not appear to be a basis for Plaintiff Mason claiming damages for humiliation and embarrassment. As he testified, he has been arrested on more than one occasion subsequently for his pro-life activities, and such arrests may be more of a "badge of honor" than a humiliation. Thus, the Court finds that damages relating to plaintiff Mason's arrest are not attributable to Defendant Feuerborn's decision to limit plaintiffs' activities to the Plaza Building.

■ However, Plaintiff Mason also testified that as a result of the events of April 12, 2002, he lost the sponsor who was providing him with a $100 monthly stipend, and the effect of this was to curtail his exercise of his free speech rights. Mason also was deprived on April 12, 2002 of his right to address passersby at the flagpole area, thereby impinging on his rightful efforts at advocacy. Plaintiff Mason obtained his position as director of Survivors' campus tour in January 2004, some 20 months later. The Court finds that based on the evidence and the totality of circumstances Plaintiff Mason should be awarded damages against Defendant Feuerborn in the amount of $2,000.

### INJUNCTIVE RELIEF

■ Plaintiffs are not entitled to prospective injunctive relief. As all parties acknowledge, the regulation challenged here has been superceded. Therefore, granting an injunction against future enforcement of the now obsolete unwritten regulation applied to plaintiffs on April 12, 2002 would have no effect.

There has been no evidence of how the new regulations are enforced, nor is there any evidence that the new regulations are imminently going to be enforced against the plaintiffs. In addition, there has been no evidence as to the reasons AHEC has adopted the new regulations, or what narrowly tailored governmental interest they may serve. Finally, there is no indication in the record that plaintiffs would have difficulty complying with the new regulations. On such an incomplete record, the Court declines to exercise its discretion to issue an injunction.

### CONCLUSION

It is, therefore, ORDERED that the Clerk of Court shall enter a declaratory judgment, consistent with this Order, in favor of Plaintiffs and against Defendant Wieske, in her official capacity as representative of AHEC, on plaintiffs' First and Second Claims for Relief based on a violation of the Free Speech Clause of the First Amendment.

Plaintiffs' request for damages against Defendant Wolf in his individual capacity is DENIED. The Clerk of Court shall enter judgment in favor of Defendant Wolf and against plaintiffs as to all claims asserted against Defendant Wolf in his individual capacity.

Plaintiff Survivors' request for compensatory damages against Defendant Feuerborn in his individual capacity is DENIED, but Plaintiff Survivors is allowed nominal damages in the amount of $1.00. The Clerk of Court shall enter judgment in favor of plaintiff Survivors and against Defendant Feuerborn in this amount.

Plaintiff Mason's request for damages against Defendant Feuerborn in his individual capacity is GRANTED and Plaintiff Mason is awarded damages of $2,000. The Clerk of Court shall enter judgment in favor of Plaintiff Mason and against Defendant Feuerborn in this amount.

It is FURTHER ORDERED that the Clerk of Court shall Dismiss the Third, Fourth and Fifth Claims for Relief pursuant to Plaintiffs' withdrawal of same.

Pursuant to Rule 54(d)(1), plaintiffs are awarded costs against Defendant Wieske, in her official capacity as representative of AHEC, as the prevailing party ·on the First and Second Claims for declaratory relief.

Pursuant to Rule 54(d)(1), plaintiffs are awarded costs against Defendant Feuerborn as the prevailing party on their First and Second Claims.

Pursuant to Rule 54(d)(1), Defendant Wolf is awarded costs against plaintiffs as the prevailing party on the First and Second Claims for damages against him in his individual capacity.

Any party seeking attorneys' fees shall file a timely motion pursuant to F.R.Civ.P. 54(d)(2)(B).